RAYMOND G. BURGE AND KATHLEEN E. BURGE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 53083. Filed April 30, 1957.

*Leon L. Rice, Jr., Esq.*, and *C. W. Womble, Esq.*, for the petitioners.
*L. P. Shields, Esq.*, and *Herman Wolff, Jr., Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income taxes for the calendar years 1950 and 1951 in the respective amounts of $12,591.24 and $10,525.80.

The item in issue for 1950 represents gain realized on the redemption of stock in a housing corporation and reported as long-term capital gain which the respondent determined to be ordinary income, either as compensation under section 22 (a) or income from the sale or exchange of stock in a collapsible corporation under section 117 (m) of the Internal Revenue Code of 1939. The item in issue for 1951 represents gain from the sale of stock in the same corporation which was also reported as long-term capital gain, but which the respondent contends represented ordinary income under section 117 (m).

Kathleen E. Burge is a party here only by reason of having made **joint income tax returns** with her husband, Raymond G. Burge.

## FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

The petitioners are husband and wife. For the calendar years 1950 and 1951, they filed joint income tax returns with the collector of internal revenue for the district of North Carolina at Greensboro, North Carolina. Petitioner Raymond G. Burge is herein referred to as the petitioner or as Burge.

When Burge was about 21 years of age he went into the business of building houses for sale, one at a time. His practice was to buy a lot, build a house on it, subcontracting the carpentry work, and sell the house on completion. He discontinued that business in the latter part of 1928, and during the depression period and until 1940 he was a workman and later a foreman for a construction company that was engaged in the construction of large buildings. From 1940 to 1946 he operated a combination drug and confectionery store in Martinsville, Virginia. He sold the store in 1946 and resumed the construction of houses for sale. In 1945 or 1946 he and another individual, as partners, acquired a lumber yard in Mayodan, North Carolina. The partnership constructed some houses for sale. It discontinued business in the early part of 1955.

In 1946, and during a short period in 1947, Burge built 12 or 15 houses in Martinsville, Virginia. He built 2 or 3 at a time, and was financed by a bank in Martinsville.

In 1946 Burge met Lawson Lester, Jr., and they explored the possibility of constructing houses in North Carolina as a joint project. In the latter part of 1947 or early 1948, Burge and Lester and several others, operating under the firm name of Burge and Lester, constructed a group of houses in High Point, North Carolina, all of which they sold. The construction of that group was financed through the Federal Housing Administration (F. H. A.). Thereafter Burge, Lester, and W. B. Pollard, a real estate and insurance agent, organized the Skyland Development Corporation in which Burge, Lester, and Pollard were officers. That corporation acquired a tract of land in or near Winston-Salem and in 1949 and 1950 it constructed thereon a group of about 25 houses which it sold. The actual construction was done by the Burge and Lester Construction Company, a partnership in which Burge and Lester were the partners. That partnership also constructed 15 houses at Madison, North Carolina, for Burmac Corporation in which Burge owned stock from 1948 to 1951.

In 1949 Burge conceived the idea of constructing apartments for rental purposes. He and his associates, Lester and Pollard, took an option on a tract of land in the western part of Winston-Salem with a view to the construction of apartments for white occupancy. However, they were advised by bank officials that the bank did not want

to finance a project for white occupancy, but would finance one for colored occupancy, stating that there was a need for the latter. They were also advised by a representative of the Winston-Salem zoning board that 1,000 apartments for colored occupancy were needed. They were also advised by representatives of the F. H. A. that there was a greater need in that area for housing projects for colored occupancy than for white. Burge and Lester became thoroughly convinced that there was a need for housing for colored occupancy, and they thereupon abandoned the white apartment project. Burge and Lester then acquired an option on a 47.32-acre tract to the east of the city for the purpose of building apartments for colored occupancy. They also acquired an option on 43 additional acres which it was thought might also be needed. This land was adjacent to a colored residential section and near a school for colored which was then being constructed.

Beginning in the spring of 1949, negotiations were opened with the F. H. A. for the purpose of procuring a guarantee of a loan for the construction of the proposed apartments. Burge, Pollard, and Lester all conferred with F. H. A. representatives in Greensboro, but Lester did most of the paperwork. A formal application for mortgage insurance was filed, dated August 18, 1949, on behalf of Park Terrace, Inc., as the proposed mortgagor. The application was signed by Burge as secretary and treasurer of the corporation. It was attested by Lester.

Pursuant to the provisions of section 608 of the National Housing Act, the F. H. A., on August 31, 1949, agreed to insure a loan in the amount of $1,632,000 for the construction of the apartments that Burge and his associates proposed to build. The estimate of the replacement cost was fixed at $1,819,908, of which $60,000 was shown as representing the fair market price of the land. The loan so insured was made to Park Terrace, Inc., by Wachovia Bank and Trust Company, Winston-Salem, North Carolina. The loan carried interest at 4 per cent and was to be repaid in 391 monthly installments of $7,344 each, commencing 18 months from the date of the mortgage.

On October 4, 1949, Burge, Lester, and Pollard organized Park Terrace, Inc., under the laws of North Carolina for the purpose of constructing the proposed apartments, which became known as Park Terrace Apartments. The F. H. A. required that the owner of a project of this size be separately incorporated, and the certificate of incorporation of Park Terrace, Inc., was in the form prescribed by the F. H. A. Article 3 of the certificate of incorporation states in part the objects for which the corporation was formed as follows:

(a) * * * to provide housing for rent or for sale, and to acquire any real estate or interest or rights therein or appurtenant thereto and any and all personal property in connection therewith.

(b) To improve and operate, and to sell, convey, assign, mortgage or lease any real estate and any personal property.

\* \* \* \* \* \* \*

(d) To apply for and obtain or cause to be obtained from the Feberal [sic] Housing Commissioner (hereinafter called the Commissioner) a contract or contracts of mortgage insurance pursuant to the provisions of the National Housing Act as amended, covering bonds, notes and other evidences of indebtedness issued by this corporation and any indenture of mortgage or deed of trust securing the same. So long as any property of this corporation is encumbered by a mortgage or deed of trust insured by the Commissioner, it shall engage in no business other than the construction and operation of a Rental Housing Project or Projects.

The total authorized capital stock consisted of 35,000 shares of class A common stock, 214,900 shares of class B common stock, and 100 shares of preferred stock. The par value of both the common and the preferred stock was $1 per share.

Under the certificate of incorporation the preferred stock carried the right to noncumulative dividends at 5 cents per share before any dividend or other distribution upon the common stock. The class B stock was entitled to noncumulative dividends of 6 per cent before payment of any dividends on the class A common stock and was entitled to preference over the class A stock on dissolution. The class B common stock could be retired after payment of all interest and principal due and after making provision for payment of operating expenses, etc., and after establishing a reserve fund for replacements. However, no such stock could be retired until after the completion of the improvements on the property, or before the final endorsement for mortgage insurance by the Federal Housing Commissioner. The class A common stock had the exclusive voting privilege, except in the case of specified defaults, in which case the preferred stock had the right to elect directors. Upon liquidation the class A common stock was entitled to the entire assets after the payment of the preferred stock and the class B common stock.

The certificate of incorporation also provided that the preferred stock might be redeemed and should be redeemed upon, but in no event before, the termination of any contract of mortgage insurance covering any indebtedness to which the F. H. A. was a party. It was also provided that the corporation should not, without approval of the holders of the majority of the shares of preferred stock, assign, transfer, dispose of, or encumber any real or personal property, including rents, except as permitted by the terms of the mortgage, and should not consolidate or merge with any other corporation, go into voluntary liquidation, effect any plan of reorganization, redeem or cancel any of its shares of preferred stock, or amend the certificate of incorporation.

From the date of incorporation of Park Terrace, Inc., to February 15, 1951, Pollard was president, Lester was vice president, and Burge was secretary and treasurer. These three also constituted the board of directors.

Park Terrace, Inc., in October 1949, issued its capital stock as follows:

| Type of stock | No. of shares | Name in which issued |
|---|---|---|
| Class B common | 41,097 | Raymond G. Burge |
| Class B common | 41,097 | Lawson Lester, Jr. |
| Class B common | 41,097 | W. B. Pollard |
| Class B common | 70,151 | Leif Valand |
| Class A common | 100 | Raymond G. Burge |
| Class A common | 100 | Lawson Lester, Jr. |
| Class A common | 100 | W. B. Pollard |
| Preferred | 100 | Federal Housing Administration |

Burge, Lester, and Pollard paid into the corporation $100 each for the class A stock issued to them. The F. H. A. likewise paid $100 for its preferred stock. The amounts due for the class B common stock were set up on the corporate books as accounts receivable from each class B stockholder in an amount equal to the par value of the stock issued to him. The only consideration for the class B common stock originally issued to Burge was the setting up of the account receivable in his name. By book entry dated October 31, 1950, Park Terrace, Inc., capitalized as part of the cost of the Park Terrace Apartments the amount of $70,151 on account of the class B common stock originally issued in the name of Leif Valand. The 47.32-acre tract of land which was the subject of the option to Burge and Lester was acquired by the corporation, but the consideration therefor is not shown by the record.

Leif Valand was the architect for Park Terrace Apartments. In the spring or early summer of 1949, Pollard, Lester, and Burge arranged to have Valand perform the architectural services in connection with the construction of such apartments for a cash fee of $9,000. It was agreed that the cash fee of $9,000 would be the sole consideration for his services. It was paid by or on behalf of Park Terrace, Inc., in installments over the period November 8, 1949, to November 30, 1950.

In accordance with the requirements of the F. H. A., Valand executed a standard form agreement between the owner and architect. Therein he stated that his services were to be rendered for $79,151, payment to be made $9,000 in cash and the issuance to him of 70,151 shares of class B stock of Park Terrace, Inc. A stock certificate for 70,151 shares of class B common stock of Park Terrace, Inc., was issued by the corporation in the name of the architect Valand on October 7, 1949. Valand did not attach any significance, importance,

or value to the stock issued in his name. In several similar projects in which Valand had been the architect, he had considered the issuance of stock as being a mere formality.

On October 15, 1949, Valand made a written offer to Park Terrace, Inc., to sell all of the class B common stock issued in his name for $500. By resolution adopted at a meeting of the board of directors on December 1, 1949, Valand's offer was rejected on the ground, as stated in the minutes, that the corporation was not then in a favorable position to purchase the stock as all available funds were needed for current operations. At that meeting Burge and Lester stated that they desired to purchase Valand's stock. The directors then directed the officers of the corporation to transfer Valand's stock on the records of the corporation to Burge and Lester "at such time as R. G. Burge and Lawson Lester, Jr. were successful in purchasing said stock from Leif Valand." On November 30, 1950, Burge and Lester Construction Company issued its check payable to Valand in the amount of $500. The $500 paid to Valand was charged on the books of the partnership in equal amounts ($250) to each of the partners with the notation "Purchase of B stock" on their accounts. Valand's stock certificate for the 70,151 shares of class B common stock was endorsed in blank by him at a time not shown by the record. There is no record on the stock book of Park Terrace, Inc., of the transfer of Valand's shares.

Park Builders, Inc., by contract with Park Terrace, Inc., dated October 12, 1949, agreed to construct the Park Terrace Apartments for the sum of $1,527,255. Park Builders, Inc., was a corporation in which Burge and Lester and their wives owned all the stock. By letter dated December 1, 1949, Park Builders, Inc., offered to reduce the contract price by the amount of $124,707.80. The offer was accepted by resolution of the directors of Park Terrace, Inc. The F. H. A. was not informed of the reduction in the contract price.

Construction of the Park Terrace Apartments was commenced in October 1949, and the construction was substantially completed in October 1950. The final advance on the construction loan was made on October 23, 1950, and the final approval of the F. H. A. loan guarantee was made on November 3, 1950. The actual cost of the project was about $176,000 less than the amount of the bank loan.

Burge, as an employee of Park Builders, Inc., supervised the construction of the Park Terrace Apartments. For those services he was paid by Park Builders, Inc., a salary of $100 a week during the period of construction from October 1949 to October or November 1950. From the date of incorporation of Park Terrace, Inc., through February 1951 the books and records of Park Terrace, Inc., do not show

the payment of salaries to its officers, except the payment of $1,000 each to Burge and Pollard in 1951. The sum of $1,000 which Burge received in 1951 from Park Terrace, Inc., was for supervising the general maintenance of Park Terrace Apartments over a period of about 10 weeks, and assisting with the rentals.

Units in the Park Terrace Apartments first became available for rent in May 1950. At about that time a rental manager of the apartments was engaged by Park Terrace, Inc., at a salary of $75 per week. The manager was engaged on a full-time basis, and he made extensive efforts to rent all apartments as they became available. The applicants for the first groups of available apartments were screened in an effort to confine rentals to a desirable class of tenants. As additional apartments became available increasing difficulty was experienced in getting tenants for them and less desirable tenants were accepted. There was a considerable turnover among the tenants, and many of them became in arrears in their rental payments. Those who were in arrears were not evicted, it being the manager's view that it would be less harmful to the business to have nonpaying tenants in some of the apartments than to have a substantial number of vacancies.

The number of apartments completed and available for occupancy between the week ended May 26, 1950, and February 9, 1951, and the number thereof which were vacant, were as follows:

| Week ended 1950 | Apartments available | Apartments vacant | Week ended 1950 | Apartments available | Apartments vacant |
|---|---|---|---|---|---|
| May 26 | 18 | 1 | Oct. 13 | 194 | 0 |
| June 2 | 34 | 1 | Oct. 20 | 200 | 3 |
| June 9 | 40 | 5 | Oct. 27 | 201 | 2 |
| June 17 | 55 | 1 | Nov. 3 | 204 | 1 |
| June 24 | 62 | 0 | Nov. 10 | 203 | 2 |
| July 1 | 75 | 4 | Nov. 17 | 355 | 148 |
| July 8 | 86 | 3 | Nov. 24 | 355 | 145 |
| July 14 | 97 | 0 | Dec. 1 | 355 | 146 |
| July 21 | 101 | 0 | Dec. 8 | 355 | 143 |
| July 28 | 106 | 0 | Dec. 15 | 355 | 144 |
| Aug. 4 | 112 | 0 | Dec. 22 | 355 | 145 |
| Aug. 11 | 118 | 5 | Dec. 29 | 355 | 147 |
| Aug. 18 | 122 | 1 | *1951* | | |
| Aug. 25 | 128 | 4 | Jan. 5 | 355 | 143 |
| Sept. 1 | 136 | 1 | Jan. 12 | 355 | 142 |
| Sept. 8 | 140 | 1 | Jan. 19 | 355 | 145 |
| Sept. 15 | 146 | 1 | Jan. 26 | 355 | 145 |
| Sept. 22 | 160 | 7 | Feb. 2 | 355 | 148 |
| Sept. 29 | 174 | 1 | Feb. 9 | 355 | 154 |
| Oct. 6 | 185 | 6 | | | |

In addition to the apartments shown above as available prior to November 17, 1950, there were other apartments which had been

completed and were ready for occupancy except for inspection and small repairs that could have been made after tenants moved in.

The F. H. A. estimated that the annual net rental income from the Park Terrace Apartments, on the basis of 93 per cent occupancy, would be $108,525. However, the books of the corporation for its first fiscal year ended October 31, 1950, showed a loss in the amount of $3,110.76, and for the fiscal year ended October 31, 1951, a loss in the amount of $106,738.73.

In the fiscal years ended October 31, 1950 and 1951, Park Terrace, Inc., had no current or accumulated earnings or profits.

During the year 1950 Pollard received a total of $6,830 as loans from Park Terrace, Inc. One of such loans, in the amount of $5,000, was entered on the books as an account receivable from Pollard. Sometime in 1950, prior to April 25, Pollard sold his 41,097 shares of class B common stock to Burge and Lester. In consideration for the sale of the stock to them Burge and Lester assumed liability for Pollard's accounts payable to Park Terrace, Inc., which consisted of the $41,097 which had been set up as his liability for the stock, and the $5,000 loan.

On November 4, 1950, the class B common stock of Park Terrace, Inc., was owned as follows:

|  | Shares |
| --- | --- |
| Raymond G. Burge | 96,721 |
| Lawson Lester, Jr | 96,721 |

The shares owned by Burge and Lester on that date consisted of the 41,097 shares originally issued to each, plus the equal division between them of the shares originally issued to Pollard and Valand.

On November 4, 1950, Park Terrace, Inc., redeemed and canceled all of its outstanding class B common stock. The redemption and cancellation were effected pursuant to resolutions of the directors adopted on that date which provided that the 193,442 shares held by Burge and Lester should be purchased for $221,000 in accordance with the offer made by them, and that such shares should be canceled and retired. At that meeting it was stated that the construction of the apartments would be completed at approximately $200,000 less than the amount estimated by the F. H. A. which resulted in an understatement of the market value of the property. It was decided that the financial status of the corporation would be more clearly reflected by carrying on the books the property at the current replacement cost as determined by the F. H. A. and a resolution was adopted directing that appropriate entries be made on the books as of October 31, 1950, to show the value of the property at the current replacement costs as determined by the F. H. A., namely, $1,819,908, of which $60,000 represented the value of the land.

Burge and Lester each received in exchange for his 96,721 shares of class B common stock the sum of $45,685 in cash and a debit [1] to his accounts receivable account in the full amount thereof on the books of the corporation. Burge's account arose as follows:

| | |
|---|---:|
| Original class B stock subscription of Burge | $41,097.00 |
| Excess cost of land charged to Burge | 669.50 |
| Pollard's accounts payable assumed by Burge | 23,048.50 |
| | $64,815.00 |

The total gain realized by Burge on the redemption of the class B common stock was $45,435, which amount he and his wife treated as long-term capital gain and reported on their income tax return for the year 1950 in the taxable amount of $22,717.50.

About a week or two before December 4, 1950, J. A. Bolich, Jr., approached Burge with a proposition that he might be able to sell the class A common stock of Park Terrace, Inc., to a housing agency of the Federal Government. At that time about one-third of the tenants of Park Terrace, Inc., were in arrears in their rents. There were rumors that an agency of the Federal Government contemplated construction of additional public housing in the vicinity which petitioner feared might result in additional vacancies in the Park Terrace Apartments. At that time another housing project near Park Terrace that had been constructed for colored occupancy had more vacancies than did Park Terrace. Under these circumstances the petitioner had about given up hope of successfully renting Park Terrace Apartments.

On December 4, 1950, Burge transferred to Bolich 34 shares of his class A common stock of Park Terrace, Inc. Lester and Pollard also transferred some of their shares to Bolich. In connection with such transfer Burge, Lester, and Pollard appointed Bolich their agent "for the purpose of selling the said class A common stock of Park Terrace, Inc., to a department or agency of the Federal Government * * *." The agency agreement was for a period of 7 months. Upon expiration of the agency agreement on July 4, 1951, the other 3 stockholders were to have the option of repurchasing from Bolich his shares at the price he had paid therefor, $1 per share. Prior to that time the owners of the class A common stock had not contacted anyone in an attempt to sell their stock.

By the latter part of January 1951, it was determined that it was not possible to sell the stock of Park Terrace, Inc., to any department or agency of the Federal Government. In January 1951, Bolich brought together Burge and Malcolm P. McLean, who was the presi-

---

[1] So stipulated; should be "credit."

dent of a trucking company and who wanted housing for his white truck drivers.

On February 15, 1951, Burge sold to McLean his 66 shares of class A common stock in Park Terrace, Inc. At the same time McLean purchased or contracted to purchase the remainder of the class A stock. At that time the petitioner expressed his wish to retain his shares of the common stock and also had in mind the possibility of doing maintenance on the apartments for McLean. However, McLean wanted to acquire all the outstanding class A stock. At that time the option on the additional land was also transferred to McLean. The consideration for the sale by Burge was $41,388.89, consisting of a cash payment of $10,833.37 and a promissory note for $30,555.52. Burge realized a total gain on the sale of the class A stock in the amount of $41,322.89, which the petitioners treated as long-term capital gain. In their 1951 return they included as taxable income the amount of $20,614.[2]

McLean, the purchaser of the class A stock, took over the operation of the Park Terrace Apartments before any principal payment became due on the mortgage loan. He caused the then tenants to move to another apartment, rented the Park Terrace Apartments to his drivers, and obtained increases in the rental rate. At the time of the hearing the corporation was still in existence. Under the occupancy conditions that existed when McLean acquired the stock of the corporation, the rental income would have been insufficient for the corporation to meet the payments on the mortgage loan.

The respondent determined that the cash distribution received by Burge in 1950 from Park Terrace, Inc., in the amount of $45,685 represented ordinary income to the extent of $45,435, and increased the petitioners' reported income by the amount of $22,717.50. For the year 1951, the respondent determined that the gain of $41,322.89 realized by Burge on the sale of his 66 shares of class A common stock of Park Terrace, Inc., was ordinary income and increased the petitioners' reported income by the amount of $20,708.89.

The 41,097 shares of class B common stock of Park Terrace, Inc., originally issued to petitioner Burge, and the 20,548½ shares acquired by him from Pollard, had been held by Burge for more than 6 months prior to the redemption of such stock on November 4, 1950.

The class A common shares of stock of Park Terrace, Inc., which were sold by the petitioner on February 15, 1951, had been held by him for more than 6 months prior to the date of such sale.

---

[2] The total gain shown in the return was in the amount of $41,228. The difference between that amount and the stipulated amount is not explained and no point is made of it by either party.

OPINION.

The principal question presented is whether section 117 (m) of the Internal Revenue Code of 1939 applies to the gain of $45,435 realized by the petitioner upon the redemption in 1950 of his class B stock in Park Terrace, Inc., and to the gain of $41,322.89 upon the sale by him in 1951 of his class A stock.

Section 117 (m), as added to the Internal Revenue Code of 1939 by section 212 of the Revenue Act of 1950, is applicable to taxable years ending after December 31, 1949, and to gain realized after that date. Insofar as material here it provides: [3]

SEC. 117. CAPITAL GAINS AND LOSSES.

(m) COLLAPSIBLE CORPORATIONS.—

(1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

(2) DEFINITIONS.—

(A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to—

(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and

(ii) the realization by such shareholders of gain attributable to such property.

\*    \*    \*    \*    \*    \*    \*

(3) LIMITATIONS ON APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

(A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation;

(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced; and

(C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such manufacture, construction, or production.

---

[3] Other provisions, relating to the purchase of inventories, and with which we are not here concerned, were added by section 326 (a) of the Revenue Act of 1951.

Subparagraph (1) in substance provides that gain from the sale or exchange (whether in liquidation or otherwise) of stock in a collapsible corporation is to be treated as ordinary income if, in the absence of section 117 (m), such gain would be considered as gain from the sale or exchange of a capital asset held for more than 6 months.

Subparagraph (2) of section 117 (m) defines a collapsible corporation, insofar as presently material, as one formed or availed of principally for the construction of property with a view to the accomplishment of two objectives, both of which must be present, namely, "the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation * * * of a substantial part of the net income to be derived from such property, and" also "the realization by such shareholders of gain attributable to such property."

The respondent contends that the petitioner's activities in prior years, and those of one of the other principal stockholders, Lester, establish that they were in the business of constructing properties for sale and that the construction of Park Terrace Apartments was within such pattern of operations. He also points to the fact that the petitioner and the other stockholders caused Park Terrace, Inc., to redeem its class B stock in 1950 shortly after completion of the apartment building and within a relatively short time thereafter, in 1951, the petitioner and the other class A common stockholders sold their class A stock. He contends that the facts clearly indicate that Park Terrace, Inc., was formed or availed of for the purposes contemplated in the definition of a collapsible corporation contained in section 117 (m) (2) and that the provisions of section 117 (m) (1) should apply to the gain on both transactions.

The petitioner, on the other hand, takes the position that Park Terrace, Inc., does not fall within that class of corporations which Congress has denominated "collapsible," relying heavily upon certain language used in the committee reports on the Revenue Bill of 1950.[4]

---

[4] In explanation of the provisions that became section 117 (m), the Ways and Means Committee of the House and the Finance Committee of the Senate used the same language (H. Rept. No. 2319, 81st Cong., 2d Sess., p. 56, 1950–2 C. B. 422, 423; S. Rept. No. 2375, 81st Cong., 2d Sess., p. 45, 1950–2 C. B. 516) as follows:

The collapsible corporation is a device which has been used in an attempt to convert ordinary income into long-term capital gain by use of a temporary corporation. The device has been used principally in the motion-picture industry. A legitimate corporation engaged in the business of producing motion pictures would pay ordinarily the corporate income tax on its net income and its shareholders would pay ordinary income tax on their dividends from the corporation. Producers have tried to avoid these results by organizing separate corporations for each motion picture. Upon completion of the film but prior to the realization by the corporation of any income therefrom, the corporation is liquidated and the assets are distributed. In such a case, the corporation pays no tax, claiming that it has realized no income. The producer pays tax upon the difference between his cost and the fair market value of the assets so distributed; but such gain is reported as long-term capital gain with a maximum effective rate of 25

percent. After liquidation, the fair market value of the released production is ordinarily amortized against the income from the film as it is received. If the income from the film does not exceed such fair market value, there is no further tax.

In addition to the motion-picture industry, it is understood that the collapsible-corporation device has also been used in the building-construction trade by contractors who have corporations construct buildings for sale and then liquidate the corporations and sell the buildings as individuals.

Under section 211 of your committee's bill the gain realized from the sale or exchange (including liquidation) of stock in a collapsible corporation will be treated as ordinary income for tax purposes. * * *

The Finance Committee of the Senate included in its report an additional explanation at pp. 88–91; 1950–2 C. B. 546–547:

This section of the bill adds a new subsection (m), relating to collapsible corporations, to section 117 of the code. The collapsible corporation is a device whereby one or more individuals attempt to convert the profits from their participation in a project from income taxable at ordinary rates to long-term capital gain taxable only at a rate of 25 percent.

Under paragraph. (1) of the subsection as added to the code, gain from the sale or exchange of stock of a collapsible corporation will be treated as gain from the sale or exchange of property which is not a capital asset. This treatment is to be effective, however, only to the extent that the use of the device is interpreted as giving rise to gain which gain is considered (but for the provisions of the subsection) as long-term capital gain.

The term "collapsible corporation" is specifically defined by paragraph (2) of the subsection to mean a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to (i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution by the corporation to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property and (ii) the realization by such shareholders of gain attributable to such property. The paragraph further states when a corporation shall be deemed to have manufactured, constructed, or produced property.

It will be noted that the term "collapsible corporation" is so defined as to include corporations lending themselves to the attempted tax-saving practice outlined above, whether they are the corporations commencing and completing the project or corporations made use of as holding companies having no other business than to separate the shareholders from the corporation undertaking the project. The corporation, furthermore, has been so defined as to describe corporations different in kind from those which ordinarily liquidate following normal business operations. This objective has been specifically strengthened by the statement made in subparagraph (i) above, to the effect that the sale or exchange or the distribution be made prior to the realization by the corporation of a substantial part of the net income to be derived from the property. Although in many cases an ordinary corporation may distribute property in kind in the course of its liquidation, or the stock in such a corporation may be sold prior to the realization by the corporation of the net income to be derived from some of its property, such a corporation could not be considered to have been formed or availed of principally for the manufacture, construction, or production of that property alone.

While the primary use made of collapsible corporations in the past has usually involved their liquidation in the manner indicated above, it is apparent that the shareholders forming or availing themselves of such a corporation could raise the same tax questions as would be raised by a liquidation by selling their stock to outside interests at the time and under the circumstances when the corporation might otherwise be liquidated. In like manner, the corporation might distribute the property in question without liquidating and, under section 115 (d), the value of the property distributed, to the extent that it was not a dividend, would first be applied against the adjusted basis of the stock to the shareholders and the excess, if any, would be taxable in the same manner as a gain from the sale or exchange of property. Paragraph (1) of the subsection, in prescribing the treatment to be given the gain from the sale or exchange of stock of a collapsible corporation, is deemed to refer to this excess value in the case of a distribution made by the corporation other than in liquidation. Such a distribution is specifically referred to in connection with the definition of the term "collapsible corporation" in paragraph (2) of the subsection. Both paragraph (1) and paragraph (2) of the subsection refer to a sale or exchange of the stock other than in liquidation.

The petitioner broadly contends that section 117 (m) was primarily intended to apply in the case of temporary corporations, for example, those set up to construct buildings for sale and to be then liquidated, the sale of the property to be made by the shareholders, whereas Park Terrace, Inc., was not a temporary corporation, nor did it construct buildings for sale, being precluded by its certificate of incorporation from doing anything but engaging in the construction and operation of a rental housing project so long as any of its property was encumbered by a loan insured by the F. H. A.

It is contended that the principals of Park Terrace, Inc., did not have the requisite intent of selling or exchanging their stock contemplated by section 117 (m), that they intended to retain their ownership to earn income, and that the sale of stock was made only after the project proved to be a disappointing financial failure. This argument apparently has reference to the class A stock. The argument is also made, and this appears to be directed toward the redemption of the class B stock, that the statute was intended to apply in the case of distributions of property manufactured, constructed, or produced, and not to distributions of cash. In this connection, the petitioner argues that it reasonably could not have been intended to cover a distribution of cash, since the statute by its terms applies only when sales or exchanges of stock or distributions are made prior to the realization by the corporation of a substantial part of the net income to be derived from the property. Rather, he says, the statute contemplates the distribution of something which in the hands of the corporation could result in ordinary income to it, whereas the excess portion of a loan obtained by the corporation which it must repay would not give rise to ordinary corporate income. Thus, he reasons that Congress did not intend to include a distribution having its source in an excessive mortgage loan. In addition, he argues that any gain derived by him as a result of the distribution of the excess portion of the mortgage loan cannot be considered as gain "attributable to" the property constructed.

A reading of the committee reports does indeed disclose that the statute was directed basically toward the kind of corporation spoken of as "temporary," utilized by individuals to convert into long-term capital gain in their hands, the income to be derived from the manufacture, construction, or production of property, by means of liquidating the corporation prior to its realization of a substantial part of the net income to be derived from the property. However, such reports also show that Congress realized that shareholders availing themselves of such a corporation could raise the same tax questions as would be raised by a liquidation by selling their stock to outside interests, or by making a distribution without liquidating. Accordingly,

in order to reach these different situations, it found it necessary, in section 117 (m), to treat as ordinary income the gain upon the sale or exchange of stock of such a corporation (whether in liquidation or otherwise). Thus, section 117 (m) may apply even though a corporation is not "temporary" but continues in existence after a sale or exchange of its stock. Furthermore, while it is true that the committee reports speak only of distributions of property and do not specifically mention distributions of cash, the statute itself, in the definition of a collapsible corporation, makes no distinction between distributions of property in kind and those in cash. We think we are bound to follow the language of the statute and not restrict the meaning of the words employed merely because the committee reports refer to the basic type of transaction which gave rise to the legislation. The word "distribution" as used throughout the Code undoubtedly embraces a distribution either of property in kind or cash, unless otherwise restricted. If Congress had intended to limit the meaning of the term in section 117 (m), we think it would have so provided. It may be that Congress deliberately refrained from confining the provision to distributions of property in kind in order to reach other transactions of the same general nature although varying from the basic type discussed in the committee reports. In any event it has been held that "[i]f Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators." *Barr* v. *United States*, 324 U. S. 83.

The fact that the certificate of incorporation of Park Terrace, Inc., precluded a voluntary liquidation of the corporation or a disposition of the constructed property without the consent of the holder of the preferred stock, the F. H. A., or a retirement of the preferred stock while the F. H. A. remained the insurer of the indebtedness, is not determinative of the question whether the corporation was a collapsible corporation. These provisions were required to protect the lender and the F. H. A. Provisions of this type, imposed for security purposes, do not necessarily indicate that the creators of a corporation may not have created the corporation with a view to the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders within the meaning of the statute.

If Park Terrace, Inc., was formed or availed of with a view to the sale or exchange by its shareholders (whether in liquidation or otherwise) of either the class A or the class B stock or a distribution to its shareholders prior to the realization by the corporation of a substantial part of the net income to be derived from the property, and with a view to the realization by the shareholders of gain attributable to the property, it comes within the definition of a collapsible corporation.

The class B stock was actually surrendered and canceled. It has been stipulated that Park Terrace, Inc., had no current or accumulated earnings in 1950 or 1951 and that the cost of construction of the apartment project was $176,000 less than the amount of the F. H. A.-insured loan which had been obtained for the construction of the apartment. Under the circumstances the obvious source of the funds used to retire the class B stock in 1950 was the unused portion of the loan. Whether this transaction should properly be considered as a partial liquidation within the definition contained in 115 (i), or whether it should properly be considered as falling within section 115 (d) we find it unnecessary to decide, since in either case the gain would normally be taxable as a gain from the sale or exchange of property, and if the stock was held for more than 6 months, would be taxable as long-term capital gain.

Burge and Lester were the principal stockholders. They owned all the class B stock at the time of redemption and at that time owned two-thirds of the class A stock. There was no requirement that the class B stock be redeemed. They paid into the corporation nothing for this stock. Accounts receivable from them were set up on the books of the corporation as the only consideration. Thus, the amounts of cash distributed to them on redemption of this stock could not be considered as a return to them of capital invested by them in the corporation. Their only cash investment was $100 each in the class A stock. It seems obvious that the class B stock could be redeemed only by authorization of the class A stockholders. The excess portion of the loan was a liability of the corporation which would have to be repaid. To the extent that the borrowed money was used to redeem the class B stock, the corporation was deprived of that means of repayment of the loan and the loan would have to be repaid out of income to be derived from the apartment building, which, so far as the record shows, was the only asset of the corporation. This, of course, would result in a reduction to that extent of funds available for distribution to the holders of the class A stock.

The petitioner testified in substance that when he entered into the project in question he wanted a source of regular income therefrom and that he thought he might obtain a salary for managing the apartments. Pollard testified that he had no idea the project would be sold, that it had been his plan to keep his interest, and that it was his understanding that he would have charge of rentals and the placement of fire insurance, which would provide him a yearly income of $5,000 or $6,000. The other principal stockholder, Lester, did not testify. Even if we were to give this testimony full credence it would have no greater effect than to establish that they did not originally intend to sell their class A stock, which was the voting stock. It would not

establish their intention as to the redemption of the class B stock and the consequent effect upon the investment value of the class A stock.

There is no testimony or other evidence to the effect that the petitioner and the other stockholders, at the time of the formation of the corporation, did not intend to cause the corporation to redeem the class B stock out of any available cash resulting from the loan in excess of the cost of the improvements. The evidence indicates that the corporation endeavored to obtain as large a loan as possible. To this end it was represented to the F. H. A. that the cost of the architectural services would be $79,151, whereas Valand, the architect, actually received $9,000, the amount agreed upon, plus $500 in connection with the surrender to the petitioner and Lester of the class B stock which had been originally issued in his name. Valand testified that the $9,000 was adequate compensation for his architectural services.

We are forced to the conclusion that the petitioner, upon whom rests the burden of proof, has failed to establish that Park Terrace, Inc., was not formed or availed of with a view to redeeming the class B common stock, prior to the realization by the corporation of a substantial part of the net income to be derived from the property, and with a view to the realization by the shareholders of gain attributable to the property.

But the petitioner contends that, since the distribution in redemption of the class B stock was made out of the excess of the loan over the cost of the construction of the property, the gain realized is not gain "attributable to" such property within the meaning of section 117 (m) (2) (ii). Clearly, this particular provision is not limited to gain realized directly by the shareholders from the sale of the property constructed after a distribution of such constructed property to them, since the statute contemplates that any gain realized by them upon a sale or exchange of their stock may be attributable to the property constructed. It is also clear that any gain to the shareholders may be considered as gain attributable to the property constructed, even though the *corporation* has not realized gain from such property. Indeed the statute basically contemplates the sale or exchange of stock or a distribution by the corporation prior to the realization by the corporation of a substantial part of the net income to be derived from the property. We think that, because the loan was made only on account of the construction of the property, the funds being advanced by the mortgagee only as construction progressed, because the redemption was justified by the corporation upon the ground that the value of the property was in excess of the cost of construction, and because the amount of the loan distributed in redemption of the class B stock would necessarily have to be repaid out of income to be derived from the property, the only logical view to be reached is that

the gain realized by the petitioner upon the redemption of the class B stock was "attributable to" the property constructed.

Section 29.117–11 (e) of Regulations 111 (promulgated in T. D. 5999, approved March 26, 1953, 1953–1 C. B. 187) contains an example in which a corporation obtained a loan insured by the F. H. A., built an apartment house for less than the amount of the loan but of a value equal to the full amount of the loan, and made a distribution of cash to its shareholder prior to the realization by the corporation of any earnings and profits, the corporation continuing thereafter. The position is there taken that the stockholder realized a gain attributable to the building constructed, that the corporation is a collapsible corporation, and that any gain to the shareholder constituted ordinary income under section 117 (m) (1). This example constitutes an administrative construction of the statute to the effect that the statute does contemplate cash distributions and that any gain resulting to a stockholder from a distribution out of the excess of a loan over construction cost may be considered as attributable to the property constructed. We cannot say that this construction in the regulations is unreasonable or inconsistent with the statute.

We approve the respondent's determination that Park Terrace, Inc., was a collapsible corporation within the definition of section 117 (m) (2). Section 117 (m) (1) provides that gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation is to be treated as gain from the sale or exchange of property which is not a capital asset. It follows that under section 117 (m) (1), the gain from both the redemption of the class B stock in 1950 and the sale of the class A stock in 1951 are to be considered as gains from the sale or exchange of property which is not a capital asset, and we approve the respondent's determination as to the gain from both the redemption and the sale. The cases of *W. H. Weaver*, 25 T. C. 1067, and *Thomas Wilson*, 25 T. C. 1058, appeal dismissed (C. A. 4, Mar. 1, 1957), are not governing here. There we held that the respondent, upon whom rested the burden of proof, had not shown that 70 per cent of the gain to the petitioner was attributable to the property constructed.

The petitioner also attempts to draw some support from the enactment of section 312 (j) of the Internal Revenue Code of 1954, which provides, with regard to distributions made after June 22, 1954, that for purposes of determining the amount of earnings or profits available for the payment of dividends, the earnings or profits are to be increased to the extent that the amount of a loan made, guaranteed, or insured by the United States exceeds the adjusted basis of the property to the corporation. Petitioner states that if the distribution of the excess portion of the mortgage was "already forestalled" by

the collapsible corporation provision, it would not have been necessary to enact section 312 (j) of the 1954 Code. We think that this does not necessarily follow and, furthermore, the Senate Finance Committee report with regard to section 312 (j) (S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 47 and 251) specifically states the committee "intends that no implication be drawn from the enactment of this subsection with respect to any decision made or litigation pending under present law with respect to this subject matter, whether or not such loans are made, guaranteed, or insured by the United States, or with respect to any other provision of this bill which may be relevant to the same subject matter, such as section 341, relating to collapsible corporations." In this same connection, it is to be noted that section 341 (a) of the 1954 Code is so worded as to clearly treat as gain from the sale or exchange of property which is not a capital asset, any gain from a distribution in partial liquidation of a collapsible corporation and any gain from a distribution made by a collapsible corporation which would normally fall under section 301 (c) (3) (A) (counterpart of section 115 (d) of the 1939 Code). In the same Senate Finance Committee report, at page 260, it is stated that this provision would apply "in the case of a corporation engaged in building, and otherwise meeting the tests of a collapsible corporation, which distributes the proceeds of a loan in excess of the adjusted basis of the property by which the loan is secured." But the report goes on to state that "Just as under section 312 (j), no inference is intended with respect to the status of present law by reason of the insertion into the statute of this rule."

In reaching the conclusions hereinabove, we have drawn no inference, one way or the other, from the provisions of the Internal Revenue Code of 1954, but have rested our conclusions upon the terms of section 117 (m) of the Internal Revenue Code of 1939.

An alternative contention made by the respondent at the hearing and on brief with regard to the holding period of some of the petitioner's class B stock need not here be considered since such alternative contention was advanced only in the event of a holding that section 117 (m) is not applicable. Nor is it necessary to consider the contentions of the respondent that the proceeds of the redemption of the class B stock constituted taxable compensation to the petitioner under section 22 (a) or dividends under section 115 (a). See, however, *George M. Gross*, 23 T. C. 756, affd. (C. A. 2) 236 F. 2d 612, *W. H. Weaver*, *supra*, and *Thomas Wilson*, *supra*, in which similar issues were decided contrary to the respondent's contentions.

Reviewed by the Court.

*Decision will be entered under Rule 50.*