186

CARL B. RECHNER, AND MARGARET T. RECHNER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HOWARD W. SWAN AND FRANCES E. SWAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 64803, 64804.   Filed April 30, 1958.

*George E. Gibson, Esq.*, and *Reece A. Gardner, Esq.*, for the petitioners.

*Edward E. Pigg, Esq.*, for the respondent.

MULRONEY, *Judge:* Respondent determined deficiencies in income tax for the year 1952 and additions to tax, as follows:

| Petitioner | Docket No. | Deficiency | Addition to tax, sec. 294 (d) (1) (A) |
|---|---|---|---|
| Carl B. Rechner and Margaret T. Rechner | 64803 | $10,918.30 | |
| Howard W. Swan and Frances E. Swan | 64804 | 8,060.82 | $931.40 |

The issues in these consolidated cases are (1) whether the gain realized by the petitioners on the transfer of stock in two corporations controlled by them to a third corporation, also controlled by them, is taxable as ordinary income from the sale or exchange of stock in a collapsible corporation within the meaning of section 117 (m) of the Internal Revenue Code of 1939 [1] or, in the alternative, is taxable to the petitioners as compensation under section 22 (a); and (2) the correct amount of the addition to the tax under section 294 (d) (1) (A) in Docket No. 64804, for failure of petitioners in that docket to file a declaration of estimated tax for 1952 within the time allowed. This second issue is purely mathematical and dependent on the determination with respect to the stock transfer.

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are so found.

Petitioners Carl B. and Margaret T. Rechner, husband and wife, are residents of Kansas City, Missouri. They filed their joint Federal

---

[1] All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.

income tax return for the year 1952 with the district director of internal revenue at Kansas City, Missouri. Petitioners Howard W. and Frances E. Swan, husband and wife, are residents of Overland Park, Kansas. They filed their joint Federal income tax return for 1952 with the district director of internal revenue at Wichita, Kansas. Petitioners Carl B. Rechner and Howard W. Swan will hereinafter be referred to as Rechner and Swan, respectively.

East Side Building Company, hereinafter called East Side, is a corporation organized under the laws of Missouri on July 26, 1949, for the purpose of providing housing for rent pursuant to section 608 of the National Housing Act. Its articles of incorporation authorize it to act as follows:

> To apply for and obtain or cause to be obtained from the Federal Housing Commissioner a contract or contracts of mortgage insurance pursuant to the provisions of the National Housing Act as amended, covering bonds, note and other evidence of indebtedness issued by this corporation and any indenture of Mortgage or Deed of Trust securing the same. So long as any property of this corporation is encumbered by a Mortgage or Deed of Trust insured by the Federal Housing Commissioner it shall engage in no business other than the construction and operation of a Rental Housing Project or Projects.

The authorized and issued capital stock of East Side consists of 100 shares of preferred stock of $1 per share par value and 199 shares of common stock of $100 per share par value. Since the date of organization all the preferred stock has been held by the Federal Housing Commissioner and the common stock has been held as follows: Rechner, 99 shares; Swan, 99 shares; and O. E. Anderson, 1 share. East Side keeps its books and files its income tax returns for fiscal years ending June 30.

Vicksburg Court, Inc., hereinafter called Vicksburg, is a corporation organized under the laws of Missouri on May 10, 1951. Its articles of incorporation provide, in part, as follows:

> The purpose for which the corporation is formed and the business and objects to be carried on and promoted by it are:
> To create a private corporation to provide housing for rent on a monthly or yearly basis to be regulated by the Federal Housing Commissioner as to rents or sales, charges, capital structure, rate of return, and methods of operation in the manner and for the purposes provided in Section 207 of Title II of the National Housing Act and the Administrative Rules and Regulations thereunder to enable the financing of the construction of such rental housing to be obtained with the assistance of mortgage insurance under the National Housing Act as amended, and as such to acquire any real estate or interest or rights therein or appurtenant thereto and any and all personal property in connection therewith. So long as any property of this corporation is encumbered by a Mortgage or Deed of Trust insured under the National Housing Act it shall engage in no other business than the construction and operation of a rental housing project.

The authorized capital stock of Vicksburg consists of 100 shares of preferred stock of $1 per share par value, which has at all times been

held by the Federal Housing Commissioner, and 200 shares of common stock of $100 per share par value of which 126 shares have been issued. From the date of organization to March 11, 1952, the outstanding shares of Vicksburg common stock were held as follows: Rechner, 62 shares; Swan, 62 shares; and O. E. Anderson, 2 shares. Vicksburg keeps its books and files its income tax returns for fiscal years ending April 30.

Concord Court, Inc., hereinafter called Concord, is a corporation organized under the laws of Missouri on September 4, 1951. Its articles of incorporation provide, in part, as follows:

The purpose for which the corporation is formed and the business and objects to be carried on and promoted by it are:

To create a private corporation to provide housing for rent on a monthly or yearly basis to be regulated by the Federal Housing Commissioner as to rents or sales, charges, capital structure, rate of return, and methods of operation in the manner and for the purposes provided in Section 207 of Title II of the National Housing Act and the Administrative Rules and Regulations thereunder to enable the financing of the construction of such rental housing to be obtained with the assistance of mortgage insurance under the National Housing Act as amended, and as such to acquire any real estate or interest or rights therein or appurtenant thereto and any and all personal property in connection therewith. So long as any property of this corporation is encumbered by a Mortgage or Deed of Trust insured under the National Housing Act it shall engage in no other business than the construction and operation of a rental housing project.

The authorized and issued capital stock of Concord consists of 100 shares of preferred stock of $1 per share par value, which at all times material herein was held by the Federal Housing Commissioner, and 20 shares of common stock of $100 per share par value. From the date of organization to March 11, 1952, the 20 shares of common stock were held as follows: Rechner, 9 shares; Swan, 9 shares; and O. E. Anderson, 2 shares. Concord keeps its books and files its income tax returns for fiscal years ending August 31.

The certificates of incorporation of East Side, Vicksburg, and Concord provide that the preferred stock of each corporation may be redeemed and shall be redeemed upon, but in no event before, the termination of any contract or mortgage insurance covering any indebtedness to which the Federal Housing Administration was a party. The certificates also provide that so long as the preferred stock remained outstanding, no other class of stock, either preferred or common, shall be purchased or redeemed or otherwise retired or canceled in whole or in part without the consent of the holders of the preferred stock.

On or about August 1, 1950, East Side completed the construction of a rental housing project consisting of 7 apartment buildings

containing 112 rental units, located on property owned by East Side in Kansas City, Missouri, which it has since continuously owned and operated.. At all times material herein such property has been encumbered by a deed of trust insured by the Federal Housing Commissioner and which was executed by East Side on September 16, 1949, to secure its deed of trust note of the same date to City Bond and Mortgage Company in the face amount of $649,000. The cost of construction of the apartment buildings was not in excess of $605,000. On August 2, 1950, East Side certified to the Federal Housing Administration and to City Bond and Mortgage Company that all bills for materials and labor for construction of the rental housing project had been paid and that there was no outstanding indebtedness against East Side as of that date. On August 14, 1950, the common stockholders and directors of East Side adopted a resolution which provided for the payment to Rechner and to Swan of $50,000 each in recognition of their services in connection with the construction of the housing project. East Side paid Rechner and Swan $20,000 each on February 6, 1951, leaving a balance of $30,000 payable to each as of December 31, 1951.

Vicksburg constructed a rental-housing project consisting of two apartment buildings located on property owned by it adjoining the property owned by East Side. These two buildings contained 33 rental units, which were fully occupied by November 1, 1951. They were initially suitable for occupancy on September 14, 1951. The rental for each unit has been at all times $75 per month. The aforesaid property has been owned by Vicksburg at all times herein material and is encumbered by a deed of trust insured under the National Housing Act. The deed of trust was executed by Vicksburg on July 3, 1951, to secure its deed of trust note of the same date to City Bond and Mortgage Company in the face amount of $182,400.

On January 28, 1952, the Federal Housing Administration wrote a letter to the City Bond and Mortgage Company which said, in part, as follows:

RE: 207 Project No. 084–00029
VICKSBURG COURT
(Vicksburg Court, Inc.)
Kansas City, Missouri

Gentlemen:

Our Underwriting Section has today advised that the subject project has been inspected and found to be acceptably completed in accordance with plans and specifications, with the exception of the following items, on which it will be necessary that an escrow agreement be prepared prior to endorsement of insurance:

Complete sodding and planting.

The sodding and planting was completed in April 1952.

Concord constructed a rental-housing project consisting of an apartment building divided into 3 sections containing 8 rental units each. The project is located on property owned by Concord adjoining the property owned by East Side. All rental units, 24 in all, were occupied by March 10, 1952. The units were ready for occupancy on February 17, 1952. On May 1, 1952, the Federal Housing Administration notified the City Bond and Mortgage Company that the Concord project had been inspected and found to be acceptably completed. The rental for each unit has at all times herein relevant been $75 per month. The aforesaid property has at all times herein material been owned by Concord and is encumbered by a deed of trust insured under the National Housing Act. The deed of trust was executed by Concord on November 26, 1951, to secure the corporation's deed of trust note on the same date to City Bond and Mortgage Company in the face amount of $139,600.

On December 27, 1951, Rechner sought advice from his tax adviser with respect to selling the stock of Vicksburg and Concord to East Side. Inquiries were made at the Federal Housing Administration about the proposed sale, and on February 11, 1952, the Federal Housing Administration approved the contemplated sale of stock to East Side if Rechner and Swan canceled the outstanding balance of the builder's fee, in the amount of $30,000 to each one, which was shown on East Side's books as payable to Rechner and Swan. Rechner and Swan agreed to cancel this obligation owed to them by East Side, and under date of March 11, 1952, journal entries were made in the books of East Side showing a debit to the account "Due Officers" and a credit to the "Building" account. On the same date journal entries were entered on the books of East Side recording its purchase of the Vicksburg and Concord stock from Rechner and Swan for $60,000.

Under the law governing loans made under the Federal Housing Administration, East Side could not have secured an additional loan to build the projects constructed by Vicksburg and Concord.

In the same letter, under date of January 7, 1952, in which inquiries were made of the Federal Housing Administration about the proposed sale of Vicksburg and Concord stock to East Side, inquiries were also made concerning the contemplated sale of the common stock in Plaza Crest, Inc., to Plaza Terrace Building Company. The stock of both these corporations was owned by Rechner and Swan.

Rechner has been in the realty business in Kansas City, Missouri, continuously since 1924. He is a past president of the Real Estate Board of Kansas City and a member of several professional associations concerned with real estate. In addition to their stockholdings

in East Side, Vicksburg, and Concord, Rechner and Swan owned stock in Westport Building Company, Plaza Crest, Inc., and Plaza Terrace Building Company. Rechner is an officer and owns 50 per cent of the stock of Colonial Builders, Inc., Plaza of Natchez Court, Plaza House, Inc., and Carlton Plaza, Inc., all of them being apartment projects in Kansas City.

On March 11, 1952, Rechner transferred to East Side 61 shares of Vicksburg common stock which he had held for more than 6 months and in which he had a zero basis, and 8 shares of Concord common stock which he had held for more than 6 months and in which he had a basis of $800. In the joint income tax return filed with his wife for the year 1952, Rechner reported long-term capital gains from the sale of the Vicksburg and Concord stock in the amounts of $17,142.88 and $12,057.12, respectively. Also on March 11, 1952, Swan transferred to East Side 61 shares of Vicksburg common stock which he had held for more than 6 months and in which he had a zero basis, and 8 shares of Concord common stock, which he had held for more than 6 months and in which he had a basis of $800. In the joint income tax return filed with his wife for the year 1952 Swan reported long-term gains from the sale of Vicksburg and Concord stock in the amounts of $17,142.88 and $11,857.12, respectively, having claimed a basis of $1,000 in the Concord stock.

### OPINION.

The issue is whether the sale by Swan and Rechner of the common stock in Concord and Vicksburg to East Side is to be regarded as the sale of stock in a collapsible corporation, within the meaning of section 117 (m), with the result that the gain realized from such sale is to be treated as ordinary income. Concord, Vicksburg, and East Side are corporations controlled by Rechner and Swan. Section 117 (m) (1) provides that gain from the sale of stock in a collapsible corporation is to be treated as ordinary income if, in the absence of section 117 (m), such gain would be considered a gain from the sale or exchange of a capital asset held for more than 6 months. Section 117 (m) (2) defines a collapsible corportaion as one formed or availed of principally for the construction of property with the view to "(i) the sale or exchange of stock by its shareholders * * * prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property and (ii) the realization by such shareholders of gain attributable to such property."

This case is practically indistinguishable from *Burge* v. *Commissioner*, 253 F. 2d 765, affirming *Raymond G. Burge*, 28 T. C. 246. There three incorporators of a corporation formed to construct an apartment house with the proceeds of an F. H. A. loan, sold their

stock some 2 or 3 months after the construction was substantially completed, and realized gain on the transfer. In holding the requirements for the application of section 117 (m) were present the court pointed out:

It is not necessary that the "view" exist at the time the corporation is formed. It is sufficient that it exist when the corporation is "availed of"; and the corporation was availed of here to dispose of all interest that the shareholders had in the project by the sale or exchange of stock before it had realized any substantial part of the net income to be derived from the property. * * *

A corporation will ordinarily be considered a collapsible corporation where the activity is principally for construction and the construction is followed by the sale by the shareholders of their stock before the corporation realizes "a substantial part of the net income to be derived from such property," and the shareholders realize "gain attributable to such property." Regs. 118, sec. 39.117 (m)–1 (d) (1) ; *Burge* v. *Commissioner*, *supra*.

Petitioners argue that this case differs from the ordinary case and the *Burge* case because here the shareholders sold their stock to a third corporation which they controlled and not to outside interests, which was the situation in the *Burge* case. There is nothing in the statute indicating a requirement that, to be a collapsible corporation, its shareholders must sell to outside interests. The statute contemplates shareholders availing themselves of the corporation by two ways, one of which is by receiving the property in liquidation. This indicates no transfer to outside interests was to be a requirement when the other way, the stock transfer way, was pursued.

In support of their contention the petitioners cite the following portion of the Senate Finance Committee Report on the Revenue Act of 1950:

While the primary use made of collapsible corporations in the past has usually involved their liquidation * * * it is apparent that the shareholders forming or availing themselves of such a corporation could raise the same tax questions as would be raised by a liquidation *by selling their stock to outside interests* at the time and under the circumstances when the corporation might otherwise be liquidated. * * * [S. Rept. No. 2375, 81st Cong., 2d Sess., 1950–2 C. B. 483, 547. Emphasis supplied.]

Petitioners argue that the sale by them of common stock in Concord and Vicksburg to East Side, which was at all times controlled by them, was not a sale to an outside interest, as that term is used in the committee report, and that consequently section 117 (m) is not applicable here.

We have examined the entire legislative background of section 117 (m), much of which is set forth in our opinion in *Raymond G. Burge*, 28 T. C. 246, and we think it apparent that Congress was concerned generally with the collapsible corporation as a "device

whereby one or more individuals attempt to convert the profits from their participation in a project from income taxable at ordinary rates to long-term capital gain taxable only at a rate of 25 percent." S. Rept. No. 2375, 81st Cong., 2d Sess., 1950–2 C. B. 483, 546. Congress used language in section 117 (m) which it thought necessary to defeat the use of this device, and, as we said in our opinion in *Raymond G. Burge, supra*, "[w]e think we are bound to follow the language of the statute and not restrict the meaning of the words employed merely because the committee reports refer to the basic type of transaction which gave rise to the legislation." Petitioners here claim long-term capital gain from the sale of the Vicksburg and Concord stock to East Side prior to the realization by Vicksburg and Concord of a substantial part of the net income to be derived from the apartment projects just as if such stock had been sold to a corporation in which the petitioners had absolutely no interest. It is perfectly conceivable that East Side could, in turn, sell the stock in Vicksburg and Concord to a stranger, in which case none of the income from the Vicksburg and Concord projects would ever come into the hands of the petitioners as ordinary income. We think this is the very thing Congress sought to prevent in section 117 (m). Moreover, as the Supreme Court held in *Barr* v. *United States*, 324 U. S. 83, "if Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators."

Petitioners have not carried their burden of proof that the two corporations, Concord and Vicksburg, were not formed or availed of with a view to the sale or exchange by its shareholders of the stock of such corporations prior to the realization by such corporations of a substantial part of the net income to be derived from the apartment projects constructed by them, and with a view to the realization by the shareholders of gain attributable to such projects. *Arthur Sorin*, 29 T. C. 959, and cases cited. We therefore sustain the respondent's determination on this issue.

Petitioners appear to rely, also, on post-construction motives for the sale of the Vicksburg and Concord stock. Regulations 118, section 39.117 (m)–1 (b) (4), provide, in part, as follows:

A corporation is formed or availed of with a view to the action described in section 117 (m) (2) (A) if the requisite view existed at any time during the * * * construction * * * referred to in that section. Thus, if the sale * * * is attributable solely to circumstances which arose after the * * * construction * * * (other than circumstances which reasonably could be anticipated at the time of such * * * construction * * *), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale * * * is attributable to circumstances

present at the time of the * * * construction * * * the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of.

Petitioners give certain reasons which they claim prompted the sale of the stock. They indicate that the buildings of the three projects were all similar in appearance and that this could conceivably lead to undesirable competition among them if they belonged to different corporations. They point to a desire to have common equipment and janitors service all three projects. They also suggest that in the event of the death of either Rechner or Swan, management problems might arise if stock ownership in the three projects became separated. In the first place, the intention to sell the stock arose some time in December 1951 when the Concord project was still under construction, so this exception which exists in the regulations could not possibly apply to it. Moreover, there is some dispute as to the date when the construction on Vicksburg was completed. However, it is not necessary to decide this latter question since we cannot believe that the reasons offered by petitioners come within the ambit of the regulations. Every one of these reasons given is due to circumstances which could reasonably have been anticipated at the time of construction, and this is especially true in the case of the petitioners, who have had considerable experience in the real estate field. Rechner had approximately 25 years in that business and Swan had considerable experience as a construction man. They had several other rental projects. Nor do we think that these particular circumstances arose after the construction of the projects. It is significant, also, that the intent to sell the stock, which was expressed in December 1951 at the time when at least the Concord project was under construction, was formed with both projects in mind. No distinction between the two was made, which is an indication that the reasons for selling the stock were due to other than post-construction circumstances. Nor can we ignore the fact that, in January 1951, inquiries about the sale of stock were made in connection with another project owned by petitioners.

Petitioners point to one other fragment of testimony on this post-construction reason issue, where Rechner said he and Swan were, "about that time," considering a buy-and-sell arrangement covering their stock in the various corporations which they had organized under the F. H. A. program. Evidently nothing came of the buy-and-sell talk between the partners and we cannot see how the testimony means anything. It certainly does not establish a post-construction motive for the stock transfers made.

Petitioners make the additional argument that the property constructed by Concord and Vicksburg was "property used in the trade or business" within the meaning of section 117 (j) and that Congress did not intend section 117 (m) to apply to such assets. A review of

the statute and the legislative history reveals that there is no foundation for this distinction. In fact, the legislative history indicates otherwise, since in the motion picture industry, where the collapsible corporation device was frequently used, it was the practice to rent the film, which was certainly "property used in the trade or business," and to amortize such rentals or income against the basis of the firm, after the corporation making the film had been collapsed. There is no merit in this argument.

Also in dispute is the amount of the addition to tax under section 294 (d) (1) (A) in Docket No. 64804. Our holding on the above issue is determinative of this amount.

*Decisions will be entered for the respondent.*