ELIZABETH M. AUGUST (FORMERLY ELIZABETH MAGEN), ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 58949, 58975, 58976, 58977, 58978. Filed July 31, 1958.

*Fred L. Rosenbloom, Esq.,* and *Thomas P. Glassmoyer, Esq.,* for the petitioners.

*Edward L. Newberger, Esq.,* for the respondent.

The respondent determined deficiencies in income tax against the petitioners for the taxable year 1950 as follows:

| Docket No. | | Deficiency |
|---|---|---|
| 58949 | Elizabeth M. August | $27,842.34 |
| 58975 | Sam Madway and Theresa Madway | 7,235.64 |
| 58976 | Ralph K. Madway and Bette D. Madway | 7,325.25 |
| 58977 | Jacob Margolis and Pauline Margolis | 5,133.80 |
| 58978 | Harry K. Madway and Beatrice B. Madway | 19,413.05 |

The questions for decision are whether a corporation of which petitioners were the shareholders and from which they received a dis-

---

[1] The proceedings of the following petitioners are considered herewith: Sam Madway and Theresa Madway (Husband and Wife), Docket No. 58975; Ralph K. Madway and Bette D. Madway (Husband and Wife), Docket No. 58976; Jacob Margolis and Pauline Margolis (Husband and Wife), Docket No. 58977; and Harry K. Madway and Beatrice B. Madway (Husband and Wife), Docket No. 58978.

tribution in redemption of part of their stock, was availed of for the construction of property with a view to the said distribution, so as to make the corporation a collapsible corporation, within the meaning of section 117 (m) (2) (A) of the Internal Revenue Code of 1939, and, if so, whether for the purposes of the limitation under section 117 (m) (3) (B), more than 70 per centum of the gain realized by the petitioners on such distribution was attributable to the property constructed.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found as stipulated.

Petitioner Elizabeth M. August, who was unmarried during the time material herein, is a resident of Merion, Pennsylvania. She filed an individual income tax return for the taxable year 1950 under the name of Elizabeth Magen. She subsequently married Henry W. August.

Petitioners Sam Madway and Theresa Madway are husband and wife, and during the time material herein were residents of Philadelphia, Pennsylvania. They filed a joint income tax return for the taxable year 1950.

Petitioners Ralph K. Madway and Bette D. Madway are husband and wife, and during the time material herein were residents of Philadelphia. They filed a joint income tax return for the taxable year 1950.

Petitioners Jacob Margolis and Pauline Margolis are husband and wife, and during the time material herein were residents of Philadelphia. They filed a joint income tax return for the taxable year 1950.

Petitioners Harry K. Madway and Beatrice B. Madway are husband and wife, and are residents of Merion, Pennsylvania. They filed a joint income tax return for the taxable year 1950.

The 1950 returns of all the petitioners were filed with the collector of internal revenue for the first district of Pennsylvania.

Elizabeth M. August, Sam Madway, Ralph K. Madway, Pauline Margolis, and Harry K. Madway are brothers and sisters. The term "petitioners" as hereafter used refers to these five individuals.

Harry K. Madway has been engaged in the building business since 1928. From 1928 to 1936, his work was that of construction superintendent, and among the construction projects superintended by him in that period were a 50-unit apartment house, built in Philadelphia in 1931, and a 150-unit apartment house in Upper Darby, Pennsylvania, built in 1932 and 1933. In 1936 he entered the building business as a principal and, except for a 3-year period during the war, when he served as a special consultant to the United States Government on housing construction, he has been continuously so engaged

since that time. After the war, he took his two brothers and his two sisters into the building business with him. Sam was a registered civil engineer, and Ralph, during some period or periods not shown, acquired substantial experience in construction work.[2]

In 1943 Harry Madway purchased an apartment house, known as Plaza Hall Apartments, which he has owned and operated since that time.

The Camden Housing Corporation, hereafter referred to as Camden, was organized under the laws of New Jersey, on July 26, 1945, with the petitioners as its only stockholders. Camden's authorized capital stock consisted of 1,000 shares of common stock, without par value. At the time of organization, petitioners subscribed for 500 shares of stock, for which $1,000 was paid and which at that time represented Camden's entire capital.

Under its charter, Camden is authorized to buy, sell, build, own, lease, and operate real estate, and shortly after its organization it acquired a tract of land in Camden, New Jersey. The tract had about 6,500 front feet and the price paid was approximately $40,000. It was partially improved. All curbs and sidewalks had been completed. The underground utilities such as sewer, water, gas, and storm sewers were largely completed, and some streets were paved. Trees had been planted along the streets throughout most of the development.

On something less than half of the above tract, Camden, in 1946 and 1947, built 126 row houses. It sold the last of these houses "about the middle of 1947."

After the completion and sale of the last of the 126 row houses, or possibly prior thereto, petitioners began to consider the construction of some apartments, with a view to owning and holding them for rental purposes. The Camden tract was regarded by them as a good site for the venture, and under section 608 of the National Housing Act, the Federal housing program offered means for the very favorable financing of such projects.

The Federal housing program was administered by the Federal Housing Administration, hereafter referred to as Federal Housing, and under the Federal Housing regulations as they then existed, mortgage loan insurance could be obtained on rental housing projects up to 90 per cent of the amount which the Federal Housing commissioner estimated would be the necessary current cost of the completed project, including the land, the proposed physical improvements, utilities within the boundaries of the project, architects' fees, taxes

---

[2] Just what the participation of the two sisters in the building business was, does not appear. Neither is there any showing as to what the legal character of the association was. Presumably the business was carried on under the name of Madway Construction Company or Madway Engineers and Constructors.

and interest accruing during construction, and other miscellaneous charges incidental to construction, provided, however, that in no event should the mortgage exceed the amount Federal Housing estimated would be the cost of the completed physical improvements on the project, exclusive of off-site public utilities and streets, and organization and legal expenses. There was the further limitation that such part of the mortgage as might be attributable to "dwelling use" should not exceed $1,500 per room, provided that the amount might be increased to $1,800 per room, where, in the discretion of the Federal Housing commissioner, cost levels so required.

Petitioners accordingly sought and procured from Federal Housing approval of the Camden tract as a site for the construction of apartment houses, on which Federal Housing would issue commitments for mortgage loan insurance.

"In October, 1947, pursuant to the provisions of section 608 of the National Housing Act," Camden "undertook the construction, upon the land which it owned in Camden, New Jersey, of twelve groups of apartment houses, to be known as the Washington Park Apartments." [3]

Also in October of 1947, Camden amended its charter, changing its authorized capital stock to 1,000 shares of preferred stock, with a par value of $100, 1,000 shares of class A common stock, without par value, and 25,000 shares of class B common stock, with par value. The stated value of both the class A and class B common stock was $2 per share. All voting rights were vested in the class A common stock, but otherwise the attributes of the class A and class B stock were identical.

Following the 1947 amendment to Camden's charter, the stockholders of the corporation received the following shares in exchange for their original holdings:

|  | Number of shares | |
| --- | --- | --- |
|  | Class A common stock | Class B common stock |
| Harry K. Madway | 50 | 300 |
| Elizabeth Magen August | 50 | 250 |
| Pauline Margolis | (1) | 100 |
| Sam Madway | (1) | 125 |
| Ralph K. Madway | (1) | 125 |
| Total | 100 | 900 |

[1] None.

The cost basis of the foregoing stock to each of the stockholders was $2 per share for both the class A and class B common stock. The

[3] This finding is as stipulated by the parties.

stock represented all of the issued and outstanding capital stock of the corporation from October 1947 until December 29, 1950.

On December 19, 1947, Federal Housing issued new regulations, which were to be effective as to all mortgages on which commitments to insure under section 608 should be issued on or after December 19, 1947, pursuant to applications filed on or after such date. These regulations, while retaining from the prior regulations the limitations above stated, provided an addditional limitation, to the effect that the principal obligation of a mortgage insured should not exceed 90 per cent of the estimate of the Federal Housing commissioner of the replacement cost of the project on the basis of the costs prevailing on December 31, 1947, for properties or projects of comparable quality in the locality. On August 12, 1948, the regulations of December 19, 1947, were amended by changing the limitation based on "dwelling use" from $1,500 and $1,800 per room to $8,100 per family unit. This amendment was to conform the regulations with the statute which Congress had similarly amended by act August 10, 1948.

Neither the date or dates of the 12 applications made to Federal Housing for commitments for mortgage loan insurance nor the amounts applied for are shown, but Camden did seek to procure commitments for mortgage loan insurance for the largest mortgage loans permissible under the statute.

In arriving at its "estimates" of replacement cost for mortgage loan insurance purposes, it was the practice of Federal Housing to include a 5 per cent builder's fee, and fees at that rate were included by Camden in its applications. It was also a Federal Housing practice to include an additional 5 per cent as an architect's fee.

As shown by Federal Housing in its project analysis sheets for the 12 projects, its "estimates" of replacement costs amounted in the aggregate to $2,427,912,[4] and 90 per cent thereof was $2,185,119. Applying the "dwelling use" limitation, however, the aggregate of the maximum insurable mortgages was $2,154,600,[5] and that amount, being $30,519 less than the 90 per cent of the "estimates" of replacement costs, represented the aggregate of the amount of the mortgages for which Federal Housing issued commitments for mortgage loan in-

---

[4] For 9 of the projects, the replacement costs in the above figure were described on the analysis sheets as "estimates" of replacement costs of the properties as of December 31, 1947. For the other 3, the amounts included are described on the analysis sheets therefor as "estimates" of replacement costs of the property. It could be that the "estimates" as to these 3 projects represented the Federal Housing "estimates" of the "necessary current cost" for the completed projects, pursuant to the regulations as they existed prior to the issuance of the regulations on December 19, 1947, although the mortgage loan insurance commitments were among the last made and they were 3 of 4 of the latest completions.

[5] In the case of the 3 projects wherein the "estimates" of replacement costs were not based on costs "as of December 31, 1947," the computations based on space were at the rate of $1,800 per room, while as to the other 9 they were at the rate of $8,100 per family unit.

surance. Included in the "estimates" of replacement costs were $106,718 for land, $100,120 for builder's fees, $105,124 for architect's fees and $17,150 for legal and organization expenses.

Based on the Federal Housing mortgage loan insurance commitments, Camden secured commitments for construction loans from the First National Bank of Philadelphia, Eastern Mortgage Service Company, and the Pennsylvania Company for Banking and Trusts. For permanent financing, it obtained commitments from the Bowery Savings Bank of New York City, whereunder, as each of the projects was completed, the Bowery Savings Bank would advance the funds to be covered by the permanent mortgage on the particular project, which funds would be used to retire the construction loans which had been obtained from the three concerns named.

According to stipulation by the parties, the following schedule shows the date of the Federal Housing commitment for mortgage loan insurance on each of the 12 projects of the Washington Park Apartments, the project numbers, the amount of each commitment, the amount of each permanent mortgage loan and the date each project was completed:

| Date of Federal Housing commitment | Project No. | Amount of commitment | Amount of permanent mortgage loan | Date completed |
|---|---|---|---|---|
| Nov. 6, 1947 | 035–40021 | $194,400 | $193,913.19 | Nov. 29, 1948 |
| Nov. 6, 1947 | 035–40025 | 194,400 | 193,913.19 | Nov. 29, 1948 |
| Nov. 19, 1947 | 035–40026 | 194,400 | 193,921.95 | Dec. 17, 1948 |
| Nov. 19, 1947 | 035–40027 | 194,400 | 193,921.95 | Dec. 17, 1948 |
| Nov. 19, 1947 | 035–40028 | 178,200 | 177,753.76 | Nov. 29, 1948 |
| Nov. 19, 1947 | 035–40029 | 178,200 | 177,753.76 | Nov. 29, 1948 |
| Mar. 4, 1948 | 035–40030 | 194,400 | 194,400.00 | Feb. 15, 1949 |
| Mar. 4, 1948 | 035–40031 | 162,000 | 162,000.00 | Feb. 15, 1949 |
| May 3, 1948 | 035–40032 | 194,400 | 194,400.00 | Apr. 20, 1949 |
| May 3, 1948 | 035–40033 | 178,200 | 178,200.00 | Apr. 20, 1949 |
| May 3, 1948 | 035–40037 | 194,400 | 194,400.00 | Apr. 20, 1949 |
| May 3, 1948 | 035–40038 | 97,200 | 97,200.00 | Apr. 20, 1949 |
| | | 2,154,600 | 2,151,777.80 | |

The building of the Washington Park Apartments was supervised and directed by Harry, Sam, and Ralph Madway. Camden did its own brick and plumbing work, with Sam handling the plumbing and Ralph the brick work.

The total cost to Camden for the construction of the Washington Park Apartments was $1,935,123.72,[6] which with $27,185.44 representing the cost of the land utilized brought the total cost of the 12 projects, when completed, to $1,962,309.16. Thus, after the construction of the 12 projects had been completed, $216,654.08 over and above the construction costs remained unexpended from the mortgage loan proceeds, which $216,654.08 Camden retained in its treasury. These

---

[6] The parties have stipulated that "petitioners' records" do not show the cost of each project. Presumably the reference to "petitioners' records" means or includes Camden's records.

unexpended mortgage funds were retained by Camden and not applied in reduction of the outstanding mortgages on the Washington Park Apartments because they were regarded by petitioners as much more valuable to them as working capital in order to produce income in other enterprises.

In the building of the Washington Park Apartments, Camden incurred and paid a builder's fee of only $21,027, which fee was paid to Madway Construction Company or Madway Engineers and Constructors. The architect's fee incurred and paid by Camden with respect to the Washington Park Apartments was $16,787.32.

The business or activity of constructing the Washington Park Apartments was Camden's principal activity during the period the said apartments were under construction. The only other activity was that of renting the apartments as they were completed.

It is stipulated that on December 30, 1949, Camden's board of directors "resolved to write up the value of the Washington Park Apartments on the books of the corporation to $2,256,165.50. The revaluation represented the average of two appraisals made, pursuant to authorization given by the Board of Directors on December 9, 1949, by A. J. Rosenfeld, A. I. A., Camden, New Jersey, and William M. Knatz, A. I. A., Upper Darby, Pennsylvania. The appraisal by Knatz was in the amount of $2,312,056.00 for the land and buildings without a separate allocation for each. Rosenfeld appraised the buildings at $2,093,357.00 and the land at $106,918.00, or a total of $2,200,275.00. As a result, a revaluation surplus in the amount of $361,057.48 was created." [7]

According to Camden's balance sheet for December 31, 1949, the book value of its fixed assets, namely, the land and apartment buildings, including building equipment, both fixed and portable, was on that date $1,895,108.02, of which $27,185.44 covered the land at its cost, while the remaining $1,867,922.58 covered book value, which was depreciated cost, of the buildings and equipment. The writeup of $361,057.48, based on the Knatz and Rosenfeld appraisals and denominated "revaluation surplus," represented the margin of Rosenfeld's appraisal for both land and improvements over book value, plus one-half of the difference between the total of his appraisal and the total shown in the appraisal by Knatz. According to the appraisal by Rosenfeld, the appreciation in the value of the land over its cost was $79,732.56, and that of the buildings and building equipment over its then book value was $225,434.42, or a total of $305,166.98 for both land and buildings. According to the Knatz appraisal, the land and improvements had appreciated in value over book value by $416,947.98, without any allocation between improvements and the land. In

---

[7] Neither of the appraisals was offered in evidence, and neither Rosenfeld nor Knatz was called to testify.

carrying the so-called "revaluation surplus" of $361,057.48 into its December 31, 1949, balance sheet, Camden allocated no part of the writeup to land, but carried the entire amount into its assets in a lump sum and as a depreciable asset and thereafter claimed depreciation on the full amount at the rate of 3 per cent.

In 1945, the year in which the petitioners organized Camden and had it purchase the land thereafter utilized as above stated, the petitioners purchased a tract of land known as Merion Park, also with a view to its future development. After the completion of the Washington Park Apartments, they began to make specific plans for the development of Merion Park through a corporation organized by them under the name of Merion Homes, Inc.

As developed, Merion Park was to consist of Colonial style, detached masonry homes, in the "$20,000 price class." It was opened in the middle of 1950, upon the completion of several sample houses. The sales response was very satisfactory.

The Merion Park development was not a Federal Housing project, but was financed under conventional mortgages, so-called, and when the sample houses were opened, it was evident that additional working capital would be needed in order to take advantage of the apparently healthy market.

On December 29, 1950, Camden redeemed 50 per cent of its class A and class B common stock and distributed to its stockholders, the petitioners herein, in exchange therefor, $205,000 of the unexpended mortgage loan funds retained in its treasury. The distribution amounted to $410 for each share of Camden stock redeemed. The amount received by each of the petitioners in redemption of their Camden stock was as follows:

| | |
|---|---:|
| Harry K. Madway | $71,750 |
| Elizabeth M. August | 61,500 |
| Pauline Margolis | 20,500 |
| Sam Madway | 25,625 |
| Ralph K. Madway | 25,625 |

The petitioners thereafter advanced to Merion Homes, Inc., all of the funds received in this distribution by Camden. They also contributed their remaining Camden stock to Merion Homes, Inc.

The petitioners in their 1950 returns reported the gain from the redemption of their Camden stock as long-term capital gain.

In his determination of deficiencies herein, the respondent determined that in accordance with section 117 (m) of the Internal Revenue Code of 1939, the gain realized by the petitioners upon redemption of their Camden stock was to be considered as gain from the sale or exchange of property which is not a capital asset.

During the years since completion of the Washington Park Apartments, petitioners have had a number of inquiries from persons who

were interested in purchasing the apartments, including four brokers having specific clients who were so interested. And though at the close of the year 1950 the operation of the apartments had resulted in an accumulated operating deficit of $39,625.24, and Camden sustained operating deficits thereafter, the petitioners not only rejected all such inquiries, but never even discussed the possibility of sale.

Based on a purpose and intent to have Camden retain and hold any excess of mortgage proceeds over construction costs so as to make such proceeds available as working capital for the production of income in other enterprises, which purpose and intent existed at and prior to completion of construction of the Washington Park Apartments, Camden was availed of by petitioners principally for the construction of the Washington Park Apartments, with a view to a distribution to themselves, as its shareholders, of all or a major portion of such retained mortgage proceeds, prior to the realization by Camden of a substantial part of the net income to be derived from the said Washington Park Apartments.

#### OPINION.

TURNER, *Judge:* According to section 117 (m) (1) of the Internal Revenue Code of 1939,[8] and subject, for the purposes of this case, to the limitation specified in section 117 (m) (3) (B),[8] gain from the sale or exchange of stock of a collapsible corporation, whether in liquidation or otherwise, which gain, but for section 117 (m), would be considered as gain from the sale or exchange of a capital asset, is to be considered as gain from the sale or exchange of property which is not a capital asset. And in section 117 (m) (2) (A),[8] a collapsible

---

[8] SEC. 117. CAPITAL GAINS AND LOSSES.

(m) COLLAPSIBLE CORPORATIONS.—

(1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation,. to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

(2) DEFINITIONS.—

(A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a) (1) (A), or for the holding of stock in a corporation so formed or availed of, with a view to—

(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and

(ii) the realization by such shareholders of gain attributable to such property.

\*    \*    \*    \*    \*    \*    \*

(3) LIMITATIONS OF APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

\*    \*    \*    \*    \*    \*    \*

(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, produced, or purchased; \* \* \*

corporation is defined as a corporation which is availed of principally for, among other things, the construction of property "with a view to" a distribution to its shareholders prior to the realization by the corporation of a substantial part of the net income from the property constructed and "to" the realization by the shareholders of gain attributable to such property.

That during the years here pertinent Camden was availed of principally for the construction of the Washington Park Apartments, that it made the distribution from the surplus mortgage proceeds prior to any realization of net income from the said apartments and, by reason of the distribution, there was a realization of gain by its shareholders, are facts shown by and found from the evidence, and we do not understand that the petitioners contend otherwise. They do contend, however, that under the statute and the regulations a purpose or intent to have Camden make a distribution must have existed during the period the apartments were under construction, and if the purpose or intent did not so exist, it may not correctly be said that Camden was availed of "with a view to" the distribution herein, and as a consequence, Camden was not a collapsible corporation within the meaning of section 117 (m) (2) (A). And as showing that the requisite purpose or intent did not exist while the Washington Park Apartments were under construction, petitioners rely upon and stress the testimony of Harry Madway, to the effect that when construction of the Washington Park Apartments was being considered they had no thought that Camden would be able to build the projects for an amount less than the mortgage proceeds; that when the mortgage loan insurance was applied for, they did not believe that the amount of the mortgages was in excess of their requirements to build the apartments; that during construction they never considered that the actual construction costs would be less than the amount of the mortgage commitments; that Camden constructed the 12 projects as one continuous operation, and "it would not have been possible to determine in any interim period whether there was any surplus fund"; and that no discussions were held by petitioners with each other, or with their counsel, regarding the redemption of stock or the withdrawal of funds, until after the sample houses in Merion Park had been opened in 1950 and the need of Merion Homes, Inc., for additional working capital arose and their counsel then recommended that the cash funds in the Camden treasury be withdrawn, by way of a partial pro rata redemption of stock, and utilized in the Merion Homes enterprise.

Specifically, the petitioners rely on that part of section 29.117–11 (b) of Regulations 111 which states that "if the * * * distribution is attributable solely to circumstances which arose after the * * * construction * * * (other than circumstances which reasonably could

be. anticipated at the time of such, * * * construction * * *), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of." If, on the basis of the testimony of Harry Madway, the claim that the distribution was attributable solely to the need of Merion Homes, Inc., for additional working capital, which need did not arise until 1950, be regarded as conclusive, then the quoted provision of the regulation would, at first blush, provide seeming support for the petitioners' contention. From the parenthetical clause of the provision quoted, it appears, however, that the requirement of the statute is satisfied if the distribution was attributable to "circumstances which reasonably could be anticipated at the time of such * * * construction," and under that provision the circumstances themselves would not in fact have to arise until after construction. We note also from the immediately preceding paragraph of the regulations that the requirement that the corporation be availed of with a view to the distribution made is satisfied if "such action was contemplated unconditionally, conditionally, or as a recognized possibility." [9]

It is thus of no particular significance whether at the time the construction of the Washington Park Apartments was first being considered the petitioners did or did not contemplate that Camden would be able to build the apartments for an amount less than the mortgages. Neither is it of any moment that the actual determination of the amount by which the mortgage proceeds exceeded total costs was not, and could not be made until after construction had been completed, nor that the petitioners did or did not discuss among themselves, or with their counsel, the withdrawal and use of the surplus mortgage proceeds, until the need of Merion Homes, Inc., for additional working capital actually came to a head. Under the regulations, it is sufficient if the circumstances which brought on or resulted in the distribution, when actually made in 1950, could, in reason, be anticipated at the time of the construction of the Washington Park Apartments and that such a distribution was contemplated

----

[9] SEC. 29.117-11. COLLAPSIBLE CORPORATIONS.—* * *

(b) * * *

Under section 117 (m) (2) (A), the corporation must be formed or availed of with a view to the action therein described * * *. This requirement is satisfied in any case in which such action was contemplated by those persons in a position to determine the policies of the corporation * * *. The requirement is satisfied whether such action was contemplated unconditionally, conditionally, or as a recognized possibility. * * *

A corporation is formed or availed of with a view to the action described in section 117 (m) (2) (A) if the requisite view existed at any time during the * * * construction * * *. Thus, if the * * * distribution is attributable solely to circumstances which arose after the * * * construction * * * (other than circumstances which reasonably could be anticipated at the time of such * * * construction * * *), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the * * * distribution is attributable to circumstances present at the time of the * * * construction * * * the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of.

"unconditionally, conditionally, or as a recognized possibility." *Carl B. Rechner*, 30 T. C. 186. And the evidence, we think, persuasively and convincingly shows not only that the distribution herein was attributable to circumstances which could be anticipated at the time of construction of the apartments, and was contemplated as a recognized possibility, but that the circumstances to which the distribution was attributable were in fact so anticipated.

It is true, as petitioners' counsel points out, that at the time the Washington Park development was being planned mortgage loan insurance commitments were not to exceed 90 per cent of the amount which the Federal Housing commissioner "estimated" would be the "necessary current cost of the completed property or project." And it is also true that, by reason of the further limitation of a maximum of $1,800 per room, later changed to a maximum of $8,100 per family unit, the aggregate of the actual commitments on the 12 projects was $30,519 less than 90 per cent of the Federal Housing commissioner's "estimates" of cost. Admittedly, however, various items covered and included in the "estimates" were included as a matter of course, and apparently without regard to whether or not in the particular project there was any likelihood that any such costs would in fact be incurred, or, if so, whether they would be incurred in such amounts. It was on that basis that the petitioners, in making their applications to Federal Housing, included an amount equal to 5 per cent of the estimated construction costs for a builder's fee, and which, with an additional 5 per cent as an architect's fee, was included in the Federal Housing "estimates" of cost. However realistic or unrealistic the "estimates" of cost of these and other items of cost for constructing the apartments may have been, the fact is that the actual cost of the projects, when completed, was in fact less by $219,476.28 than the amount of the mortgage loan insurance commitments, which in turn were $30,519 less than 90 per cent of the Federal Housing commissioner's "estimates" of cost of the completed projects. For cases similar in that respect, see *Carl B. Rechner, supra; Arthur Sorin*, 29 T. C. 959; *Glickman* v. *Commissioner*, 258 F. 2d 108, affirming a Memorandum Opinion of this Court; *Pool* v. *Commissioner*, 251 F. 2d 233, affirming a Memorandum Opinion of this Court, certiorari denied 356 U. S. 938; *Raymond G. Burge*, 28 T. C. 246, affd. 253 F. 2d 765; *W. H. Weaver*, 25 T. C. 1067; *Thomas Wilson*, 25 T. C. 1058; and *George M. Gross*, 23 T. C. 756, affd. 236 F. 2d 612.

Harry Madway and his two brothers were experienced builders, Harry's experience dating back to 1928. Sam was an experienced engineer, and had been associated with Harry since shortly after the end of the war. Ralph likewise had accumulated substantial

experience in the building trade and, among other things, knew how to supervise and direct brick work. They were the planners of the Washington Park Apartments, and supervised the construction thereof. And even though the 12 projects were constructed as one continuous operation, and by reason thereof, it may have been difficult to compute or determine with definiteness the actual costs which had been incurred at any given date, or to compute with certainty the actual costs until some period after construction had in fact been completed, it is reasonable to expect and conclude, taking their ability and experience into account, that they did have some rather definite idea as to the relation of costs to available funds as the work progressed and that they could and did reasonably anticipate that when all accounts were settled the mortgage funds would exceed the costs incurred in some amount, even though the exact amount had to await later computation and determination.

Included in the "estimates" of cost on which the mortgage loan insurance commitments were based, was $100,120 as builder's fees, whereas the amount actually incurred and paid by Camden was $21,027, and we are certain that the petitioners were not unaware of that margin. Also included was $105,124 for architect's fees, whereas the amount actually incurred and paid was only $16,787.32. Another item of included cost was $106,718 for land, whereas the land used had actually cost Camden $27,185.44. Another amount included, which was not in the nature of direct building construction cost, was $17,150 for legal and organization expenses, and while the record is silent as to the amount actually incurred and expended by Camden for that purpose, the only item of comparable nature actually reflected by Camden in its balance sheet of December 31, 1950, was $59.50, described as incorporation expense, and presumably related to the corporate organization of Camden in 1945.

The evidence also shows that the brick work was done under the direction and supervision of Ralph, to the end that Camden was able to do its own brick work at a much lesser cost than could have been done through subcontractors. Similarly, Sam, handling the plumbing work, was able to show very substantial savings thereon. As to the brick work, Harry did testify that "actually" they "probably spent a little more than [they] had hoped [they] could buy it for," the implication from context apparently being that actual cost was a little more than the estimates therefor in their applications to Federal Housing. But, on the whole, his testimony in explanation of the brick work estimates was quite vague and uninformative, consisting in the main of generalities and suppositions, and the amounts representing actual cost, the original estimates by petitioners as reflected in their applications, or the Federal Housing "estimates" on which

the mortgage loan insurance commitments were actually made not being shown, actual comparison of cost with the estimates is not possible. It was the testimony of Harry, however, that Camden completed its brick work at a figure $150,000 below the lowest bid which had been received, and that by doing its own plumbing work, it finished that work at a figure which was $60,000 below the lowest bid. And while we have no way of knowing just how the actual cost of either the brick work or the plumbing work compared with the "estimates" therefor by the Federal Housing commissioner, the evidence of record does not persuade or lead us to believe that those "estimates" were substantially lower than the prices at which such work could have been done under contract.

We are accordingly convinced that a resulting excess of mortgage proceeds over costs in some amount reasonably could have been, and in fact was, anticipated at the time and in the course of construction of the Washington Park Apartments, even though the exact amount was not and could not be known until after construction had been completed.

We are convinced that the subsequent distribution in the manner in which it actually occurred was likewise anticipated by the petitioners at or prior to the time construction was completed. In that connection, the testimony of Harry Madway is, we think, quite revealing. When asked as to the reasons why Camden retained the excess of the mortgage proceeds, instead of applying them in reduction of the mortgages which stood against the Washington Park Apartments, it was his response that such application of the funds was not considered because those funds were much more valuable to them, the petitioners, as working capital in order to produce income in other enterprises. The facts show that the funds after distribution by Camden to its shareholders were used exactly for that purpose.

The Merion Park property had been purchased with a view to future development, at or about the same time that the purchase of the Camden property by Camden was instigated by the petitioners. And when the Washington Park Apartments had been completed and all of the Camden tract had been absorbed by development, the petitioners next turned their attention in continuation of their building and development activities to Merion Park. Presumably the type of construction envisioned for Merion Park, taking into account its location and other characteristics, was not such as could be financed under the Federal Housing program. At any rate, it was not so financed. In the course of that construction, additional working capital was needed, and the petitioners, in keeping with the purpose indicated by Harry's testimony, turned to the excess mortgage proceeds from the

Washington Park development, which had been retained at all times by Camden because it would be valuable to petitioners in producing income in other enterprises, such as Merion Park, and the distribution herein was made.

We accordingly conclude that the evidence of record and the facts shown thereby require the conclusion that Camden was a collapsible corporation, within the meaning of section 117 (m) (2) (A), and we so hold. *Glickman* v. *Commissioner, supra; Carl B. Rechner, supra;* and *Raymond G. Burge, supra.*

Petitioners make the further claim that application of section 117 (m) to the gain realized by them upon the distribution by Camden is precluded by the 70 per cent limitation prescribed in section 117 (m) (3) (B). Relying on section 29.117-11 (c) (3) of Regulations 111,[10] they seek to demonstrate that more than 30 per cent of the said gain was attributable to the land, thus leaving less than 70 per cent as being attributable to the property constructed. More specifically, they rely on that part of the said regulation which states that "[f]or the purpose of this limitation, the gain attributable to the property referred to in section 117 (m) (2) (A) is the excess of the recognized gain of the shareholder during the taxable year upon his stock in the collapsible corporation over the recognized gain which the shareholder would have if the property had not been * * * constructed * * *. In the case of gain on a distribution in partial liquidation * * * the gain attributable to the property shall not be less than an amount which bears the same ratio to the gain on such distribution as the gain which would be attributable to the property if there had been a complete liquidation at the time of such distribution bears to the total gain which would have resulted from such complete liquidation."

---

[10] Sec. 29.117-11 (c) (3) *Seventy-percent rule.*—This section shall apply to the gain recognized during a taxable year upon the stock of a collapsible corporation only if more than 70 percent of such gain is attributable to the property referred to in section 117 (m) (2) (A). If more than 70 percent of such gain is so attributable, then all of such gain is subject to this section, and, if 70 percent or less of such gain is so attributable, then none of such gain is subject to this section.

For the purpose of this limitation, the gain attributable to the property referred to in section 117 (m) (2) (A) is the excess of the recognized gain of the shareholder during the taxable year upon his stock in the collapsible corporation over the recognized gain which the shareholder would have if the property had not been manufactured, constructed, [or] produced * * *. In the case of gain on a distribution in partial liquidation or a distribution described in section 115 (d), the gain attributable to the property shall not be less than an amount which bears the same ratio to the gain on such distribution as the gain which would be attributable to the property if there had been a complete liquidation at the time of such distribution bears to the total gain which would have resulted from such complete liquidation.

Gain may be attributable to the property referred to in section 117 (m) (2) (A) even though such gain is represented by an appreciation in the value of property other than that manufactured, constructed, [or] produced * * *. Where, for example, a corporation owns a tract of land and the development of one-half of the tract increases the value of the other half, the gain attributable to the developed half of the tract includes the increase in the value of the other half.

The argument made may be summarized somewhat as follows: If there had been a complete liquidation of Camden on December 31, 1950, instead of the partial liquidation resulting from the distribution of the $205,000 from the surplus mortgage loan funds, the gain realized by petitioners on their Camden stock would have been $315,203.52, being the excess of Camden's December 31, 1950, book surplus of $317,203.52 over $2,000, the basis of the Camden stock to petitioners; the land itself, assumed in a raw state and without any of the improvements which had been constructed, had a value at December 31, 1950, of at least $106,918,[11] the amount at which it had been included in the Federal Housing "estimates" for mortgage loan insurance purposes, and assuming the apartments had not been built and there had been a complete liquidation of Camden on the same date, the gain to the Camden shareholders would have been $104,918, namely, the $106,918 less $2,000, thus leaving $210,285.52 of the said total gain to the shareholders on complete liquidation as the amount attributable to the property constructed; the $104,918 thus being the portion of the total gain which would have been attributable to the land upon complete liquidation, and being 33.28 per cent of $315,203.52, the said total gain, and the remaining $210,285.52 being only 66.72 per cent of the said total gain, it follows that less than 70 per cent of the gain realized by petitioners on the distribution herein was attributable to the property constructed, and the limitation prescribed in section 117 (m) (3) (B) accordingly applies. As substantiating the proposition that the December 31, 1950, value for the land, "without reference to the buildings," was at least $106,918, petitioners stress and rely upon the testimony of a witness called to give opinion testimony and who expressed an opinion that the December 31, 1950, value of the land was $114,700.

In our efforts to follow the argument so advanced, we have encountered difficulties both in fact and in law. From a reading of the regulation, it is apparent that one of the facts essential to its application is the amount of total gain which would have been realized by the shareholders in the event there had been a complete liquidation. Generally speaking, the gain to stockholders of a corporation on complete liquidation is the excess of the fair market value of the property distributed, including cash, subject, of course, to liabilities, if any, remaining against the property, over the basis to the stockholders of their stock. We do know, from the evidence, that the basis of the Camden stock to the petitioners was $2,000, but we do not know what the fair market value of the apartments was at December 31, 1950. And in the absence of a showing of what their

---

[11] The Federal Housing analysis sheets show $106,718, rather than $106,918, as the amount at which the land was included. See our Findings of Fact.

total gain would have been if there had been a complete liquidation of Camden, instead of the partial liquidation which did occur, the petitioners, in applying the regulation, have substituted for such total gain the amount of Camden's book surplus as of that date.

The petitioners did, as indicated, offer the opinion testimony of one witness as to the value of the land alone at December 31, 1950, and that witness did express his opinion thereof. He was not questioned, however, and no other witness was called to testify, as to the fair market value of the apartments as a whole, either as one property or as 12 properties. Neither was anyone called to testify as to the value of the buildings and other improvements separate and apart from the land.

Since in their argument they have treated book surplus at December 31, 1950, as representing the gain the stockholders would have had if Camden had been completely liquidated on that date, it may be that petitioners regard the writeup as of December 31, 1949, plus the book value of Camden's assets as of that date, as establishing the fair market value of those assets. We do know, of course, that the December 31, 1949, writeup was based upon appraisals made by two individuals, and represented an amount which was the difference between the book value of the Camden assets and the lower of the two appraisals, plus one-half the difference between the lower appraisal and the higher appraisal, and that in the lower appraisal there was an allocation between the land and improvements, whereas in the higher appraisal there was no such allocation. As showing the fair market value of Camden's assets at December 31, 1949, to say nothing of their value at December 31, 1950, the proof goes no further than to show that the appraisals were made, the names of the men making the appraisals and the amounts thereof. The two individuals were not called as witnesses, and we know nothing of their qualifications, nor do we know anything about the basis for their conclusions.[12] We do know, on the other hand, that Camden on its books made no allocation of the writeup between the land and improvements, but carried the entire amount into assets in a lump sum as a depreciable asset, and that it thereafter claimed depreciation on the full amount at 3 per cent.

As we read the regulation, however, its application would not be conclusive in the instant case, even if we did have adequate proof of the amount of the total gain which would have been realized by the

---

[12] Possibly the letters "A. I. A." which followed the names of the two individuals in the stipulation quoted in our Findings of Fact are supposed to throw some light on their competency and ability as appraisers, but, if so, the stipulation does not so show, and there is no evidence of record to that effect.

petitioners on their Camden stock if Camden had been completely liquidated on December 31, 1950. The regulation does not provide the fixed formula assumed by petitioners for the determination of the amount attributable to the property constructed, in the case of a partial liquidation, but merely fixes a floor therefor, by providing that in the case of partial liquidation of a collapsible corporation, the gain realized by the shareholders which is attributable to the property constructed shall not be "less" than an amount which bears the same ratio to the total gain realized by the shareholders on such partial liquidation as the gain attributable to the property constructed bears to the total gain which would have been realized by the shareholders if there had been a complete liquidation of the corporation, rather than a partial liquidation. The petitioners, in their application of the regulation, would substitute the word "more" for the word "less," which would make it read directly contra to its plain wording. And since, for reasons stated hereafter, we are of the view that all of the gain realized by the petitioners on the partial liquidation of Camden was attributable to the property constructed, it follows, if we are correct in that view, that the amount attributable to the property constructed could not be "less" than the ratable amount indicated by the regulation, and the requirements of the regulation are to be regarded as satisfied.

In *Raymond G. Burge, supra*, where the distribution was likewise from surplus mortgage funds and also a distribution in partial liquidation, it was held that the gain realized by the shareholders was "gain attributable to the property constructed," and for the construction of which the loan had been made. On appeal, our decision therein was affirmed, the Court of Appeals stating that "[t]he answer, of course, is that without the construction of the property there would have been no construction loan and no excess therein to be distributed to shareholders of the corporation." It is true that the language with which we were concerned in the *Burge* case was from section 117 (m) (2) (A) (ii), whereas we are presently concerned with the meaning of section 117 (m) (3) (B), but be that as it may, the language in question in the two sections is identical and no reason has been advanced, and we know of none, whereby Congress would have intended different meanings to identical language in separate provisions of the same statutory subsection.

We do not understand that the petitioners challenge the interpretation of the subject language in section 117 (m) (2) (A) (ii) as it appears in our opinion and in the opinion of the Court of Appeals in the *Burge* case, but they do contend that in the *Burge* case the application of the 70 per cent limitation was not in issue, and, relying

upon their interpretation of the language of the regulation discussed above, argue that, by reason of the value of the land alone at the time of distribution, a ratable part of the gain realized by them on the distribution made was attributable to the land, and was in such ratable amount that the gain which could be regarded as having been attributed to the property constructed was less than 70 per cent of the total gain, for the purposes of section 117 (m) (3) (B).

While it is true that the 70 per cent limitation prescribed by section 117 (m) (3) (B) was not in issue in the *Burge* case, it was in issue in *Glickman* v. *Commissioner*, *supra*, which closely parallels the instant case. In *Glickman*, where, as in this case, the cost basis to the shareholders of all the corporate stock was likewise $2,000, and the surplus mortgage funds were $55,400 and the distribution in partial liquidation $55,000, the taxpayers, on the basis of the claimed factual premise that at the date of distribution the value of the land alone had increased from its cost of $59,000 to $120,945, contended that at least 30 per cent of the gain to them on distribution was attributable to appreciation in the value of the land "apart from building construction." Rejecting that contention, the court stated that it was "far too narrow an interpretation of the statute to be accepted," and as to the cash distribution, stated further that the Tax Court had correctly held that all of it was directly attributable to the constructed property, since it was paid out of funds advanced "on the F. H. A. mortgage." The court did note that actually there had been no finding that the value of the land alone was $120,945, as the taxpayers had claimed. But aside from any question as to the absence of such a finding in the *Glickman* case, or as to the sufficiency or insufficiency of the proof of the value of the land alone in the instant case, we regard the *Glickman* case as a case in point, which, in principle, is directly contra to the interpretation of the statute and regulations for which petitioners contend.

Finally, we note from Webster's New Collegiate Dictionary, Second Edition, that one of the definitions of the word attribute is "to ascribe by way of cause." Since the gain of the stockholders in the instant case was realized in toto by reason of the distribution made from the surplus mortgage funds and the said surplus funds were available only because of the construction of the apartments, it would appear reasonable to ascribe the gain "by way of cause" to the property constructed. *Glickman* v. *Commissioner*, *supra*, and *Raymond G. Burge*, *supra*.

We accordingly conclude and hold that the gain realized by the petitioners by reason of the distribution made by Camden in redemption of part of its stock is taxable according to the provisions prescribed by section 117 (m) of the Code.

*Decisions will be entered for the respondent.*