Murray Sorin and Patricia Sorin (Husband and Wife) v. Commissioner.
Sorin v. Commissioner
Docket No. 89661.
United States Tax Court
T.C. Memo 1964-87; 1964 Tax Ct. Memo LEXIS 252; 23 T.C.M. (CCH) 524; T.C.M. (RIA) 64087; March 31, 1964
*252 Samuel Becker, for the petitioners. Joseph M. Touhill, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in the petitioners' income tax for 1950 in the amount of $17,283.90. The issue is whether the amount of $50,000 received by petitioner Patricia Sorin is taxable as ordinary income as a distribution from a collapsible corporation under section 117(m) of the Internal Revenue Code of 1939. [1]
Findings of Fact Some of the facts were stipulated and they are so found. The parties have also stipulated that all of the oral and documentary evidence submitted to this Court in the case of Arthur Sorin, 29 T.C. 959, affd. 271 F. 2d 741, is deemed to have been again so submitted to this Court in the instant case and made a part of the record of this case. Murray Sorin and Patricia Sorin, husband and wife, are residents of New York, New York. They filed a joint income tax return for 1950 with the then collector of internal revenue for the former second district *253 of New York. Arthur Sorin is the brother of Murray Sorin. During and prior to the taxable year, the Sorin brothers were employed on a full-time basis as executives of an air-conditioning firm. Prior to 1949 neither Murray nor Arthur had any experience in the building or construction business. During 1944 Murray purchased vacant land in Forest Hills, New York for $60,000. In 1948 Murray acquired an adjoining plot of unimproved land for $40,000. Arthur furnished 37 percent of the total purchase price of $100,000. The Sorin brothers learned that it was possible, under the rules of the Federal Housing Administration (hereinafter called F.H.A.), for owners of real property to lease their land on a long-term basis to a building corporation. They decided to have apartments constructed on their Forest Hills property under F.H.A.-insured financing to make the land produce continuing income. Before the F.H.A. project, the land, vacant from 1944 to 1949, had not been productive. The procedure of the F.H.A. in determining whether it would insure mortgages under section 608 of the National Housing Act, as amended, was as follows: (a) the proposed mortgagor first made an application to *254 a lending institution for a loan; (b) the proposed mortgagor was required to arrange for temporary financing by way of building loan agreement and for permanent financing by way of mortgage by a lending institution; (c) as part of its application to a lending institution for a loan, the proposed mortgagor was required to submit a site plan containing a sketch of the project, detailed information showing the plan of construction and operation, an estimate of rental income and operating expenses, and an estimate of replacement cost of the property. The Federal Housing Administration was permitted to insure mortgages in the amount of 90 percent of its total estimated replacement cost of the property, but the amount of the mortgage to be insured could not exceed $1,800 per room, which was later changed to $8,100 per apartment; (d) the detailed information was then submitted by the proposed mortgagee to the Federal Housing Administration and examined and evaluated by the Federal Housing Administration's architectural, valuation and mortgage risks examining sections; (e) the proposed mortgagee then applied to the Federal Housing Administration for mortgage insurance and, if such mortgage *255 insurance were approved, construction was commenced. Construction was inspected by Federal Housing Administration employees; insured building loan advances could not be disbursed by the lender without the consent of the Federal Housing Administration, and rents were frozen at the amount determined by the Federal Housing Administration; and (f) the Federal Housing Administration received from the mortgagee an examination fee of 3/10 of 1 percent of the principal amount of the mortgage insured and an annual premium for such mortgage insurance of 1/2 of 1 percent of the existing mortgage indebtedness. On May 4, 1949 the Sorins organized Garden Hills, Inc., a New York corporation, to construct and operate a garden-type rental housing project known as Garden Hills, situated in Forest Hills, consisting of 138 family apartments located in five separate buildings. The corporation issued 100 shares of preferred stock to the F.H.A. and also issued one share of common stock, each, to Henrietta A. Sorin (Arthur's wife) and to Patricia. The value of Patricia's stock in Garden Hills, Inc. has at all times here material been in excess of 10 percent of the outstanding stock of the corporation. *256 Garden Hills, Inc. was an accrual basis taxpayer with a taxable year ending October 31. On November 17, 1949 the following events took place: Garden Hills, Inc. leased the Forest Hills land from Murray for $10,880 a year for 99 years, renewable for an additional 99-year term at the same rental. Garden Hills, Inc. entered into a building loan agreement with The County Trust Company under which said County Trust Company agreed to advance the sum of $1,156,000 to be used for the purpose of constructing the Garden Hills project to be secured by a bond and a mortgage insured by the F.H.A. The Sorin brothers and their wives executed a personal indemnity agreement to The County Trust Company. Garden Hills, Inc. executed a mortgage for $1,156,000 on its leasehold in favor of The County Trust Company. The F.H.A. insured said mortgage of $1,156,000 pursuant to the provisions of section 608 of the National Housing Act, as amended. The F.H.A., in its "COMMITMENT FOR INSURANCE" issued in August 1949 for the Garden Hills project, had approved the lease of the Forest Hills land. The $1,156,000 amount insured by the F.H.A. had been computed as follows: (1) The estimated replacement cost as of *257 December 31, 1947 was computed to $1,314,667, and the estimated replacement cost as of August 10, 1949 was computed to be $1,322,220. (2) The lower of the two estimated replacement costs, $1,314,667, plus $272,000, the market price of the land, totaled $1,586,667, the replacement cost of the property in fee simple. Ninety percent of the resulting figure was $1,428,000. From this amount the market price of the land was subtracted, leaving a balance of $1,156,000. The market price of the land used in the above computation, $272,000, is the price at which the F.H.A. could purchase the land if it acquired the corporation's interest pursuant to the National Housing Act. On December 8, 1949 Murray conveyed to Arthur, a tenant in common, an undivided 37 percent interest in the land in recognition of the interest which Arthur had in the land by having 37 percent of the total purchase price. Construction of the project was performed by J. Friedman Construction Co., Inc., a company owned by Friedman. Construction proceeded slowly and weeks passed without activity at the building site. Friedman spent much time out of town, and Murray could obtain no satisfaction from the construction company's *258 superintendent. Murray retained an architect to check on the progress of the job. The construction of the project known as Garden Hills by Garden Hills, Inc. was completed on January 24, 1951. On April 23, 1951 The County Trust, as mortgagee, certified to the F.H.A. that construction of Garden Hills was complete, and further certified that the mortgage proceeds in the amount of $1,156,000 had been advanced to Garden Hills, Inc. on the dates and in the amounts as follows: Date
Amount
Feb. 9, 1950
$ 78,336.04
Mar. 8, 1950
57,871.00
Apr. 10, 1950
68,367.00
Apr. 25, 1950
55,526.00
May 24, 1950
144,587.80
June 26, 1950
201,179.27
July 26, 1950
102,483.72
Aug. 28, 1950
89,157.19
Sept. 28, 1950
87,194.21
Oct. 25, 1950
79,278.42
Dec. 1, 1950
30,840.11
Jan. 4, 1951
25,303.27
Mar. 19, 1951
9,218.20
Apr. 23, 1951
126,657.77 Each advance included the total purchase price of uninstalled materials plus the cost of portions of work acceptably completed, as approved by The County Trust Company and the F.H.A., less 10 percent and less prior advances. Garden Hills, Inc. made its last payment to the J. Friedman Construction Co., Inc. in May 1951. A total *259 of $1,036,721 was paid by Garden Hills, Inc. to the construction company. On April 23, 1951 The County Trust Company required that $11,304 be held in escrow until certain work was done satisfactorily. In addition to the work which required the escrow deposit, the Sorins discovered that certain work performed by the construction company was unsatisfactory. Other contractors were engaged by the Sorins to perform this additional work. The total capitalized cost of constructing the Garden Hills project as of January 1951, as ascertained from the books and records of Garden Hills, Inc., amounted to $1,095,681.16 and represented direct costs and carrying charges to date of completion. The basis of the entire project, exclusive of the write-up for the leasehold in the amount of $285,318.84, would have been approximately $1,095,000. The cost of curbs, gutters, sidewalks, trees, planting strips, sewers and water mains amounting to $40,025 was not charged to Garden Hills, Inc. In an agreement dated November 1, 1949 executed by Patricia and the J. Friedman Construction Co., Inc., Patricia individually guaranteed payment of this amount. The agreement also provided that the above-mentioned *260 work would be completed in 14 months. In November 1950 Garden Hills, Inc. owed a substantial amount of money to the construction company. On November 17, 1950 Garden Hills, Inc. distributed $100,000 in cash to its two common stockholders. Patricia and Henrietta each received $50,000. After this distribution, Garden Hills, Inc. had $10,036.65 in cash. It is stipulated (1) that Garden Hills, Inc. had no earnings or profits in the year of distribution, nor did it have any accumulated earnings or profits from any prior year; and (2) that the distribution ceived by Patricia in 1950 was not a distribution in partial or complete liquidation of the corporation. The accountants for Garden Hills, Inc. advised the Sorin brothers that the distribution should not have been made because the corporation did not have a surplus, as required by State law. Murray did not want to return the amount distributed. The accountants suggested that a surplus might be created by obtaining an appraisal of the corporation's property since such an appraisal might indicate that the corporation's leasehold exceeded its cost. It is stipulated that "[during] the year of the distribution * * * Garden Hills, *261 Inc. wrote up on its books the value of its leasehold interest, consisting of the lease and the buildings constructed thereon, by an amount which was in excess of the distribution. The amount of such write-up ($285,318.84) was credited on the corporation's books to an account denominated 'Capital Surplus'. This increase was based on an appraisal by Wm. A. White & Sons dated December 20, 1950." The $100,000 distribution to Patricia and Henrietta on November 17, 1950 represented part of the substantial amount then due to the J. Friedman Construction Co., Inc. The final payment of $125,123.10 to the construction company in May 1951 resulted in an overdraft of $65,208.36 in the Garden Hills, Inc. bank account. To satisfy the overdraft, Garden Hills, Inc. borrowed $75,000 on May 14, 1951 from the bank on a short-term basis. Henrietta and Patricia individually guaranteed repayment of the loan. The Sorin brothers also guaranteed repayment of the loan and agreed that securities owned by them were to secure the loan made to Garden Hills, Inc. After several short renewals of the $75,000 loan and its partial repayment, Garden Hills, Inc. paid the balance of its indebtedness in 1952. Patricia *262 and Henrietta each loaned $25,000 to Garden Hills, Inc. to repay the then outstanding loan of $50,000. During the construction of the Garden Hills project neither Patricia, Henrietta, nor Arthur rendered any services to Garden Hills, Inc. Murray devoted some little time to conferences with the contractor. Since the completion of the project it has been managed by an operating agent. At the date of the $50,000 distribution to Patricia in November 1950 she had owned her stock in Garden Hills, Inc. for more than 6 months. She did not hold the stock as stock-in-trade property or other property of a kind properly includable in inventory if on hand at the end of the taxable year, nor did she hold the stock primarily for sale to customers in the ordinary course of her trade or business. Petitioners, in their joint income tax return for 1950, treated the distribution received by Patricia in the amount of $50,000 as a distribution under section 115(d) of the Internal Revenue Code of 1939. Schedule D of the joint return reported as a net long-term gain the amount of $49,900, which amount was the net gain realized. Respondent determined that the distribution of $50,000 received in 1950 *263 by Patricia was "subject to tax (to the petitioners) as ordinary income." Garden Hills, Inc. was formed or availed of principally for the construction of property with a view to the realization by its shareholders of gain attributable to the property through a distribution to its shareholders, before the realization by it of a substantial part of the net income to be derived from the property. Opinion In Arthur Sorin, supra, this Court held that Garden Hills, Inc. was a "collapsible corporation" within the meaning of section 117(m) and that the gain on the distribution of $50,000 to Henrietta Sorin in November 1950 was taxable to her as ordinary income. We also held that subsection 117(m)(3)(B), [2] which limits the application of section 117(m), did not apply, stating that the taxpayer had not shown that the $50,000 distribution to Henrietta "was not attributable to the constructed property, * * * nor, on the present record, that less than 70 per cent or, in fact, anything less than all of the distribution was so attributable." *264 The present case involves the same $100,000 distribution made by Garden Hills, Inc. in November 1950 to its two stockholders, except that we are now considering the $50,000 portion distributed to Patricia. As stipulated, the evidence submitted in the prior case is again before us. Petitioner's sole argument on brief is that the limitations of section 117(m)(3)(B) apply because the gain in 1950 was not attributable to property constructed. Petitioners state their position as follows: "The evidence in this case * * * has supplied the deficiency in the proof upon which the decision in Arthur Sorin was based. This evidence shows that the gain here is not attributable to an enhanced land value brought about by a building development. It is attributable to the value of a leasehold on the land, arising from the difference between the fair rental value of the land and the rent reserved in the lease." Petitioners argue that the gain in this case occurred on November 17, 1949 when Garden Hills, Inc. leased the vacant Forest Hills land from Murray. Petitioners' only new witness testified (1) that the annual rental of $10,880 under the November 17, 1949 lease represented a 4 percent return *265 on $272,000, the value assigned to the land by the parties to the lease; (2) that this was a favorable lease for Garden Hills, Inc. because, as of that date, a 10 percent return on the value of the land, about $27,000, would be a fair rental value; (3) that the difference of approximately $16,000 between the $10,880 rental and the "fair rental value" of $27,000 should be capitalized at 10 percent, or $160,000; and (4) that this amount of $160,000 represents the "value of the leasehold on the land alone" as of November 17, 1949. There is no merit in petitioners' argument. They have not shown, any more than did the taxpayers in Arthur Sorin, supra, that the gain recognized by them in 1950 was not attributable to the property constructed by Garden Hills, Inc. The rule is clear that appreciated land values that arise from a building development, or from the preliminary work leading up to an F.H.A. commitment to insure the mortgage on a contemplated building project, are attributable to the property constructed. J. D. Abbott, 28 T.C. 795, affd. 258 F. 2d 537; Paul Braude, 35 T.C. 1158; Jack Farber, 36 T.C. 1142, affd. *266 312 F. 2d 729. In Max Mintz, 32 T.C. 723, affd. 284 F. 2d 554, this Court said that "[the] increase in value of the land that is attributable to its use in a section 608 project has been viewed as part of the profit relating to the property constructed for purposes of the 70 per cent rule." Here the cost of the vacant land (purchased in 1944 and 1948) was $100,000, and it had been unproductive from 1944 to 1949. In May 1949 Garden Hills, Inc. was formed to construct and operate the housing project, and preferred stock was issued to the F.H.A. as a prerequisite to obtaining mortgage insurance. By August 1949 the F.H.A. had issued its commitment for insurance on the project in the amount of $1,156,000. The commitment recognized that Garden Hills, Inc. would lease the land for an annual rental of $10,880, and it also specified the amount of $272,000 as the price at which the F.H.A. could purchase the land if it acquired the corporation's interest under the National Housing Act. It would appear, therefor, that the value of $272,000 assigned to the land as of November 17, 1949 fully reflected the contemplated project to be constructed on the land *267 under an F.H.A. insured mortgage. Even if we should accept the rationale of petitioners' argument that, in some manner, a favorable lease enhanced the value of the land as of November 17, 1949, there are other weaknesses in petitioners' attempted proof. The witness' testimony that a 10 percent return on a land value of $272,000 would be a fair rental as of November 17, 1949 simply ignores the fact that the lease itself fixes the annual rental at $10,880, and there is no suggestion that the lessor and the lessee did not act at arm's length. [3] Petitioners' so-called expert witness has also failed to impress us with his conclusion that a 10 percent return would be a fair rental for vacant land in Forest Hills on the given date. Moreover, the witness seems to assume that no portion of the $272,000 value assigned to the vacant land on November 17, 1949 was created by the anticipated construction of the building project. On this record, such an assumption is clearly unwarranted. At any rate we do not believe that petitioners have shown that any portion of *268 the approximately $172,000 increase ($272,000 minus $100,000 cost) in the agreed valuation of the vacant land as of November 17, 1949 represents value apart from subsequent construction of the project. We find, and so hold, that petitioners have not shown that the limitations of section 117(m)(3)(B) are applicable to the facts of this case. We sustain respondent. Decision will be entered under Rule 50. Footnotes
1. All section references will be to the Internal Revenue Code of 1939, as amended, unless otherwise noted.↩
2. Subsection 117(m)(3)(B) provides that in the case of gain realized by a shareholder upon his stock in a collapsible corporation, the general rule of section 117(m)↩ "shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property" constructed by the corporation.
3. The annual rental of $10,880 in the lease is about 10 percent of the actual cost of the land ($100,000) to the lessors.↩