LOUIS BENEDEK AND JANET BENEDEK,[1] ET AL., PETITIONERS *v.* COMMISSONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 81900–81903.    Filed August 12, 1968.

*Martin C. Barell, Jacquin D. Bierman,* and *Marvin B. Tepper,* for the petitioners.

*John B. Murray, Jr.,* and *Jack S. Older,* for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in income tax of the petitioners as follows:

| Petitioners | 1950 | 1951 |
| --- | --- | --- |
| Louis and Janet Benedek | $16,203.88 | $87,009.62 |
| Henry and Myrtle G. Hirsch | 95,681.63 | 334,666.10 |
| Alexander P. and Mary E. Hirsch | 95,483.68 | 338,079.94 |
| Martin and Leonore Benedek | 48,796.25 | 212,738.09 |

[1] Cases of the following petitioners are consolidated herewith: Henry Hirsch and Myrtle G. Hirsch, docket No. 81901; Alexander P. Hirsch and Mary E. Hirsch, docket No. 81902; and Martin H. Benedek and Leonore Benedek, docket No. 81903.

The issue for decision is whether the Farragut corporations, of which the petitioners were stockholders and from which they receive distributions in 1950 and 1951, were collapsible corporations within the meaning of section 117(m) of the Internal Revenue Code of 1939 [2] and whether, for the purposes of the limitation in section 117(m) (3)(B), more than 70 percent of the gain recognized by the petitioners on such distributions was attributable to property constructed by the corporations.

### FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

All of the petitioners are individuals who were legal residents of New York, N.Y., at the time their petitions were filed in this case. Louis and Janet Benedek, Martin and Leonore Benedek, Henry and Myrtle Hirsch, and Alexander and Mary Hirsch are, respectively, husband and wife and filed their joint Federal income tax returns, using the cash receipts and disbursements method of accounting, for the taxable years 1950 and 1951 with the then collector of internal revenue for the first district of New York. Louis and Martin Benedek and Henry and Alexander Hirsch will collectively be referred to as the petitioners.

On September 3, 1947, Newstrand Realty Corp. (Newstrand) was incorporated in the State of New York. The common stock of Newstrand was owned 25 percent by Morris Kavy, 25 percent by Henry Hirsch, 25 percent by Alexander Hirsch, 16⅔ percent by Martin Benedek, and 8⅓ percent by Louis Benedek. Martin Benedek was president, Morris Kavy was vice president, Henry Hirsch was second vice president, Alexander Hirsch was treasurer, and Nathan Neitlich was secretary. All but Nathan Neitlich were members of the board of directors.

In 1947, the New York Water Service Corp. (Water Corp.), a regulated public utility, owned a substantial amount of property in Brooklyn, N.Y. The City of New York, through condemnation proceedings, took possession of a part of the Water Corp.'s property on June 30, 1947. When the City took possession, the compensation to the Water Corp. had not been determined. The part taken by the City was the source of much of the earnings of the Water Corp., which was also anticipating at that time the maturity in 1951 of its first-mortgage bonds. For these reasons, the Water Corp. decided to sell another large tract of its Brooklyn property.

Newstrand purchased such other tract from the Water Corp. at a price of $1,764,238.66 and acquired title on November 14, 1947. The

---

[2] All statutory references are to the Internal Revenue Code of 1939. In regard to distributions similar to those in this case under the Internal Revenue Code of 1954, see sec. 312(j) of such Code.

tract contained a total of 1,144,525 square feet, of which 55,900 square feet was sold by Newstrand to third persons and 189,700 square feet was condemned by the City of New York.

On January 25, 1949, the following corporations were incorporated in the State of New York: Farragut Gardens No. 1, Inc; Farragut Gardens No. 2, Inc.; Farragut Gardens No. 3, Inc.; Farragut Gardens No. 4, Inc.; and Farragut Gardens No. 5, Inc. Each of the Farragut corporations was owned by the same persons in the same proportions as Newstrand, and the officers and directors of the Farragut corporations were the same as the officers and directors of Newstrand. The purposes of the Farragut corporations were leasing the unimproved tract purchased by Newstrand from the Water Corp., constructing, operating, and managing housing projects on this tract, and securing Federal Housing Administration (FHA) insured mortgage loans to finance the projects.

Newstrand leased the tract to the Farragut corporations in five separate leases dated at various times from April 27, 1949, to October 4, 1949, for a total annual rental of $76,960. Each lease was prepared in accordance with lease forms prescribed by the FHA, and each was for a term of 99 years renewable at the option of the lessee for an additional 99 years at the same annual rental. The leases further provided that should the leasehold mortgagee or the FHA as mortgage insurer acquire title to the leasehold interests of the Farragut corporations because of a default by the lessee, the leasehold mortgagee or the FHA could acquire the lessor's fee title in the land upon payment of a fixed price, known as the "recapture price." The recapture prices for the land leased by the Farragut corporations total $1,924,000.

Under the terms of the leases, the net annual rental was fixed at 4 percent of the recapture price. During the years 1950 and 1951, and at all relevant times, such percentage was uniformly applied in FHA leasehold projects.

The FHA applications filed by the Farragut corporations were approved, commitments were issued by the FHA, and mortgage loans were made by the Manhattan Co. and insured by the FHA in the total amount of $21,719,300. The amount of a mortgage insured by FHA was determined by reference to the replacement cost of the property; FHA-insured mortgages up to 90 percent of the total estimated replacement cost of the property. The value of the Farragut Gardens' leasehold interest did not influence the amount of the insured loan because it is not considered part of the replacement cost of the project.

The Farragut corporations constructed on their leaseholds 59 apartment buildings containing 2,496 apartments at a total construction cost of $18,118,987. Permanent certificates of occupancy, which evi-

denced completion of the buildings and authorized their occupancy, were issued by the Department of Housing and Buildings of the City of New York to each of the Farragut corporations on dates ranging from December 21, 1949, to July 10, 1951.

Distributions of $396,000 were made by the Farragut corporations to their stockholders in 1949. In 1950, the Farragut corporations made distributions of $50,000 to Louis Benedek, $100,000 to Martin Benedek, $150,000 to Alexander Hirsch, $150,000 to Henry Hirsch, and $150,000 to Morris Kavy. In 1951, the Farragut corporations made distributions of $180,166.67 to Louis Benedek, $360,333.33 to Martin Benedek, $540,500 to Alexander Hirsch, $540,500 to Henry Hirsch, and $540,500 to Morris Kavy. Total distributions by the Farragut corporations in 1949, 1950, and 1951 were thus in the amount of $3,158,000. When such distributions were made, the Farragut corporations had no accumulated or current earnings or profits, and the corporations suffered operating losses from 1949 at least through 1954. They engaged in no business or activity other than the construction and operation of the apartment buildings on their leaseholds.

In 1955, civil actions were commenced in the U.S. District Court, Eastern District of New York, by Norman P. Mason in his official capacity of Federal Housing Commissioner and by the Farragut corporations against the petitioners, among others, as defendants. Such actions sought, among other things, the recovery of funds alleged to have been wrongfully paid and distributed by the Farragut corporations to the petitioners. On July 19, 1957, the actions were settled, and on August 27, 1957, the petitioners repaid $1,600,000 to the Farragut corporations.

Real estate taxes on property located in the city of New York are determined by applying a fixed rate to the assessed valuation of the property. The law applicable during the years involved in this case provided that city tax assessors should state "the sum for which, in their judgment, each separately assessed parcel of real estate would sell under ordinary circumstances if it were wholly unimproved; and separately stated, the sum for which the same parcel would sell under ordinary circumstances with the improvements, if any, thereon." New York, N.Y., Adm. Code sec. 155b–1.0 (ch. 929, Laws of 1937). The fiscal year of the City of New York for the purposes of assessing real estate taxes commences on July 1 and ends on the following June 30. The actual physical assessment of real property is begun in August, and the assessed valuation of such property is entered in the month of January, preceding the commencement of the fiscal year.

The market value of unimproved property in the Brooklyn area increased between 1948 and 1951. A number of factors, such as strong

housing demand, increased availability of building materials, and liberalized Government housing programs contributed to the increases in market values. Such increases were reflected in increased valuations by the City of New York for purposes of real property taxation.

The tract leased by the Farragut corporations from Newstrand was assigned assessed valuations by assessors of the City of New York for the fiscal years beginning July 1, 1950, and July 1, 1951, of $2,971,000 for the land as if wholly unimproved. The Farragut corporations contested such valuations and after trial, the Supreme Court of New York fixed the value of the land as if wholly unimproved at $2,730,650 for the fiscal year beginning July 1, 1950, and $2,696,775 for the fiscal year beginning July 1, 1951.[3]

The fair market value of the tract leased by the Farragut corporations from Newstrand at the times the tract was leased in 1949 was $2,800,000. Based upon this fair market value of the tract, the fair market value of the leaseholds held by the Farragut corporations was $1,517,333 at the same dates.

OPINION

Our sole issue is whether the gains realized by the petitioners in 1950 and 1951 upon receipt of cash distributions from the Farragut corporations should be taxable as a return of capital since the corporations had no accumulated or current earnings and profits or whether such gains should be taxable as ordinary income under the collapsible corporation provisions of section 117(m), which provide in part:

SEC. 117. CAPITAL GAINS AND LOSSES.
  (m) COLLAPSIBLE CORPORATIONS.—

      \*       \*       \*       \*       \*       \*       \*

  (2) DEFINITIONS.—

    (A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, \* \* \* or for the holding of stock in a corporation so formed or availed of, with a view to—

        (i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, \* \* \*

This case is one of a long line of cases in which a corporation received an FHA-insured loan in excess of the cost of construction and

---

[3] The valuation of one lot in the tract was not contested for the fiscal year beginning July 1, 1950, and the assessor's valuation for that lot was therefore applicable. The figure in the text for 1950 represents the total effective valuation for the tract.

distributed the excess to its shareholders. E.g., *Max Mintz*, 32 T.C. 723 (1959), affd. 284 F. 2d 554 (C.A. 2, 1960) ; *Elizabeth M. August*, 30 T.C. 969 (1958), affd. 267 F. 2d 829 (C.A. 3, 1959) ; *Arthur Sorin*, 29 T.C. 959 (1958), affirmed per curiam 271 F. 2d 741 (C.A. 2, 1959) ; *Raymond G. Burge*, 28 T.C. 246 (1957), affd. 253 F. 2d 765 (C.A. 4, 1958). From a reading of such cases, the Farragut corporations appear to fit the definition of a collapsible corporation. Furthermore, since the respondent has determined that the Farragut corporations come within the definition of a collapsible corporation, the petitioners have the burden of proving that the corporations are not collapsible; and since the petitioners have not denied that the corporations are collapsible, we assume, for purposes of this case, that they come within the statutory definition. *Arthur Sorin, supra.*

The petitioners have rested their case on the contention that section 117(m) (3) (B) applies in this case and makes section 117(m) inapplicable to the distributions received by them. Section 117(m) (3) (B) provides:

(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, produced, or purchased; * * *

Consequently, we must determine what percentage, if any, of the distributions to the petitioners from the Farragut corporations was attributable to the construction of apartment houses, and what percentage, if any, was attributable to an increase in value of the land or leaseholds on which the apartment houses were constructed. Land is not regarded as a collapsible asset, and hence a distribution attributable to an increase in value of land, unrelated to construction, would not be taxed according to the provisions of section 117(m). See, e.g., *Max Mintz, supra; Elizabeth M. August, supra; Arthur Sorin, supra.*

The petitioners argue that they purchased the land at less than fair market value, that the land then increased substantially in value, and that the Farragut corporations, due to the concern of the FHA and the absence of arm's-length bargaining, were able to enter into very favorable leases of the land. Therefore, the petitioners argue, the leaseholds held by the Farragut corporations had substantial values, and more than 30 percent of the distributions made by the corporations was attributable to such values.

The petitioners purchased the land for $1,764,238.66. The purchase price may have been below the fair market value of the land. Certainly the land increased in value between the time of its purchase in 1947 and the time it was leased to the Farragut corporations in 1949. The leases favored the Farragut corporations considerably. On the basis of all of the evidence, including expert testimony, we have arrived at a

value for the land in 1949, 1950, and 1951 of $2,800,000. In reaching this conclusion, we were impressed by the valuation of approximately $2,700,000 determined by the Supreme Court of New York for purposes of the property tax. However, we have increased that valuation by $100,000 since the Supreme Court's determination represents an aggregate of the values determined for a number of separate parcels of land and since the entire tract is worth more than the aggregate of the values for the included parcels. Also on the basis of expert testimony, we have determined that a fair annual rental for the land was $168,000, or 6 percent of its fair market value. Since the actual annual rental to the Farragut corporations was $76,960, the leases have a fair market value of $91,040 per year, or based on a capitalization rate of 6 percent (which we think is appropriate), a total fair market value of $1,517,333. Thus, we agree with the petitioners as to the value of the leases.

The respondent argues that some or all of the increase in the value of the land between 1947 and 1949 was due to the proposed use of the land for the construction of a huge apartment house project. This Court has often held when an increase in value of land is due to the construction of apartments thereon, the gain is attributable to construction of property for purposes of section 117 (m) (3) (B). *Glickman* v. *Commissioner*, 256 F. 2d 108 (C.A. 2, 1958), affirming a Memorandum Opinion of this Court; *Max Mintz, supra; Elizabeth M. August, supra.* However, the petitioners have established that in this case, the value of the leases was not due to the contemplated use of the land. Thus, the petitioners have succeeded in establishing that the leases had a value of $1,517,333 which was not due to the construction of collapsible property.

The petitioners' argument is that the apartment buildings had no value in excess of the mortgage loans to which they were subject, and that since the leases had substantial value, the distributions must be attributable to the value of the leases. However, the petitioners have failed to prove that the value of the buildings did not exceed the mortgages. They furnished testimony showing that the buildings were unprofitable, and there were some statements that the buildings could not be sold for more than the mortgages. Yet, this evidence is insufficient to establish the fair market value of the buildings. It fails to show that their fair market value did not exceed the mortgage loans. Accordingly, the petitioners have failed to prove one essential fact on which their argument rests, but our decision is not based solely upon this failure of proof.

Even if the petitioners had proved that the buildings were not worth more than the mortgages, still they have failed to show that more than

30 percent of the gain was attributable to the value of the leasehold interests. In *Braunstein* v. *Commissioner*, 374 U.S. 65, 70 (1963), the Supreme Court said "the phrase 'attributable to' merely confines consideration to that gain caused or generated by the property in question." Thus, the test is what caused the distributions, or what property—land or buildings—generated them?

The answer is clear: The distributions were caused by, and generated by, the construction of the apartment buildings. The Farragut corporations received loans totaling $21,719,300 as a result of the construction of the apartment buildings; had they not been built, the loans would not have been received. The amount of the loans was determined as a percentage of the replacement costs of the buildings, and the amount was not affected by the value of the leasehold interests— it was not increased by reason of the valuable leases which the Farragut corporations held on the properties. The total construction costs were $18,118,987, so that during the years 1949, 1950, and 1951, the Farragut corporations received as loans $3,600,313 in excess of the costs of construction. During those same years, they distributed to the shareholders $3,158,000. It is clear that the distributions were derived from the surplus of the mortgages. Although the leases were valuable, there was no realization of such value so that none of the funds distributed were derived from the value of the leases. The petitioners have not shown any way in which the value of the leases made possible the distributions to the shareholders. On the contrary, all the evidence indicates that the distributions were generated by the construction of the apartment buildings. What this Court said in *Elizabeth M. August, supra*, is equally applicable to this situation. "Since the gain of the stockholders in the instant case was realized in toto by reason of the distribution made from the surplus mortgage funds and the said surplus funds were available only because of the construction of the apartments, it would appear reasonable to ascribe the gain 'by way of cause' to the property constructed." (30 T.C. at 987) See also *Glickman* v. *Commissioner, supra; Payne* v. *Commissioner*, 268 F. 2d 617 (C.A. 5, 1959), affirming 30 T.C. 1044 (1958); *Max Mintz, supra*.

The petitioners argue at considerable length that they have proved facts which were not proved in the *Murray Sorin* case, 23 T.C.M. 524, 33 P–H. Memo. T.C. par. 64,087 (1964), and that the regulations support their position. Section 29.117–11(e), Regs. 111, contains an example involving an FHA-financed project. In the example, there was a surplus of borrowed funds which was distributed to the shareholder. One of the facts in the example was that the constructed property increased in value. The example concluded that the distributions

were attributable to the construction of property. The petitioners in this case reason that since they have established that the value of the constructed property did not exceed the mortgages, and that there was an increase in the value of the leasehold interests, it follows from the example that the distributions are attributable to the leasehold interests. We do not agree with their reasoning. It does not follow that the example would have reached a different conclusion if the facts were changed. There is nothing in the example to indicate that if the building did not increase in value, but the land did, the distributions would be attributed to the land.

It is true that the petitioners in this case have proved that their leasehold interests had substantial value not attributable to the construction of the buildings, a fact not proved in the *Murray Sorin* case; nevertheless, for the reasons already given, we have concluded that the gain of the petitioners was not attributable to the value of the leaseholds. It does not necessarily follow that because the petitioners have proved the independent value of the leases, the distributions were attributable to the land.

In conclusion, we hold that the gains of the petitioners were attributable to the construction of the apartment buildings, collapsible property, and the regulations and precedents relied upon by the petitioners do not support their position.

In order to reflect uncontested adjustments in the notices of deficiency,

*Decisions will be entered under Rule 50.*